## THIEL *v.* SOUTHERN PACIFIC CO.

No. 349.   Argued March 25, 1946.—Decided May 20, 1946.

---

[3] A judgment in a *coram nobis* proceeding is final and appealable in Illinois.   See *People* v. *Green,* 355 Ill. 468, 189 N. E. 500.

*Allen Spivock* argued the cause and filed a brief for petitioner.

*Arthur B. Dunne* argued the cause and filed a brief for respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Petitioner, a passenger, jumped out of the window of a moving train operated by the respondent, the Southern

Pacific Company. He filed a complaint in a California state court to recover damages, alleging that the respondent's agents knew that he was "out of his normal mind" and should not be accepted as a passenger or else should be guarded and that, having accepted him as a passenger, they left him unguarded and failed to stop the train before he finally fell to the ground. At respondent's request the case was removed to the Federal District Court at San Francisco on the ground of diversity of citizenship, respondent being a Kentucky corporation. Several vain attempts were then made by the petitioner to obtain a remand of the case to the state court; petitioner was also restrained from attempting to proceed further in the state court.[1]

After demanding a jury trial, petitioner moved to strike out the entire jury panel, alleging *inter alia* that "mostly business executives or those having the employer's viewpoint are purposely selected on said panel, thus giving a majority representation to one class or occupation and discriminating against other occupations and classes, particularly the employees and those in the poorer classes who constitute, by far, the great majority of citizens eligible for jury service . . ." Following a hearing at which testimony was taken, the motion was denied. Petitioner then attempted to withdraw his demand for a jury trial but the respondent refused to consent. A jury of twelve was chosen. Petitioner thereupon challenged these jurors upon the same grounds previously urged in relation to the entire jury panel and upon the further ground that six of the twelve jurors were closely affiliated and connected with the respondent. The court denied this challenge. The trial proceeded and the jury returned a verdict for the respondent.

---

[1] The injunction against petitioner proceeding in the state court was affirmed upon appeal. *Thiel* v. *Southern Pacific Co.*, 126 F. 2d 710; certiorari denied, 316 U. S. 698.

Petitioner renewed his objections in his motion to set aside the verdict or, in the alternative, to grant a new trial. In denying this motion the court orally found that five of the twelve jurors "belong more closely and intimately with the working man and employee class than they do with any other class" and that they might be expected to be "sympathetic with the experiences in life, the affairs of life, and with the economic views, of people who belong to the working or employee class." The Ninth Circuit Court of Appeals affirmed the judgment in its entirety, 149 F. 2d 783, and we brought the case here on certiorari "limited to the question whether petitioner's motion to strike the jury panel was properly denied."

The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. *Smith* v. *Texas,* 311 U. S. 128, 130; *Glasser* v. *United States,* 315 U. S. 60, 85. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

The choice of the means by which unlawful distinctions and discriminations are to be avoided rests largely in the sound discretion of the trial courts and their officers. This

discretion, of course, must be guided by pertinent statutory provisions. So far as federal jurors are concerned, they must be chosen "without reference to party affiliations," 28 U. S. C. § 412; and citizens cannot be disqualified "on account of race, color, or previous condition of servitude," 28 U. S. C. § 415. In addition, jurors must be returned from such parts of the district as the court may direct "so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly burden the citizens of any part of the district with such service," 28 U. S. C. § 413. For the most part, of course, the qualifications and exemptions in regard to federal jurors are to be determined by the laws of the state where the federal court is located, 28 U. S. C. § 411.[2] *Pointer* v. *United States,* 151 U. S. 396. A state law creating an unlawful qualification, however, is not binding and should not be utilized in selecting federal jurors. See *Kie* v. *United States,* 27 F. 351, 357.

The undisputed evidence in this case demonstrates a failure to abide by the proper rules and principles of jury selection. Both the clerk of the court and the jury commissioner testified that they deliberately and intentionally excluded from the jury lists all persons who work for a daily wage. They generally used the city directory as the

---

[2] Federal statutes prohibit the service by any person as a petit juror "more than one term in a year," 28 U. S. C. § 423, exempt from jury service artificers and workmen employed in the armories and arsenals of the United States, 50 U. S. C. § 57, and set up disqualifications for service as a juryman or talesman "in any prosecution for bigamy, polygamy, or unlawful cohabitation, under any statute of the United States," 28 U. S. C. § 426.

See, in general, Blume, "Jury Selection Analyzed: Proposed Revision of Federal System," 42 Mich. L. Rev. 831; Report to the Judicial Conference of Senior Circuit Judges of the United States of the Committee on Selection of Jurors (1942); Report of the Commission on the Administration of Justice in New York (1934).

source of names of prospective jurors. In the words of the clerk, "If I see in the directory the name of John Jones and it says he is a longshoreman, I do not put his name in, because I have found by experience that that man will not serve as a juror, and I will not get people who will qualify. The minute that a juror is called into court on a venire and says he is working for $10 a day and cannot afford to work for four, the Judge has never made one of those men serve, and so in order to avoid putting names of people in who I know won't become jurors in the court, won't qualify as jurors in this court, I do leave them out. . . . Where I thought the designation indicated that they were day laborers, I mean they were people who were compensated solely when they were working by the day, I leave them out." The jury commissioner corroborated this testimony, adding that he purposely excluded "all the iron craft, bricklayers, carpenters, and machinists" because in the past "those men came into court and offered that [financial hardship] as an excuse, and the judge usually let them go." The evidence indicated, however, that laborers who were paid weekly or monthly wages were placed on the jury lists, as well as the wives of daily wage earners.

It was further admitted that business men and their wives constituted at least 50% of the jury lists, although both the clerk and the commissioner denied that they consciously chose according to wealth or occupation. Thus the admitted discrimination was limited to those who worked for a daily wage, many of whom might suffer financial loss by serving on juries at the rate of $4 a day and would be excused for that reason.

This exclusion of all those who earn a daily wage cannot be justified by federal or state law. Certainly nothing in the federal statutes warrants such an exclusion. And the California statutes are equally devoid of justification for

the practice. Under California law a daily wage earner may be fully competent as a juror. A juror, to be competent, need only be a citizen of the United States over the age of 21, a resident of the state and county for one year preceding selection, possessed of his natural faculties and of ordinary intelligence and not decrepit, and possessed of sufficient knowledge of the English language. California Code of Civil Procedure, § 198. Cf. § 199. Nor is a daily wage earner listed among those exempt from jury service. § 200. And under the state law, "A juror shall not be excused by a court for slight or trivial causes, or for hardship, or for inconvenience to said juror's business, but only when material injury or destruction to said juror's property or of property entrusted to said juror is threatened . . ." § 201.

Moreover, the general principles underlying proper jury selection clearly outlaw the exclusion practiced in this instance. Jury competence is not limited to those who earn their livelihood on other than a daily basis. One who is paid $3 a day may be as fully competent as one who is paid $30 a week or $300 a month. In other words, the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror. Wage earners, including those who are paid by the day, constitute a very substantial portion of the community,[3] a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low

---

[3] In the San Francisco-Oakland industrial area in 1939 there were 76,374 wage earners employed by manufacturers out of a total population (as of 1940) of 1,412,686. Sixteenth Census of the United States: 1940, Manufactures 1939, Vol. III, p. 80.

economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do.

It is clear that a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship.[4] But that fact cannot support the complete exclusion of all daily wage earners regardless of whether there is actual hardship involved. Here there was no effort, no intention, to determine in advance which individual members of the daily wage earning class would suffer an undue hardship by serving on a jury at the rate of $4 a day. All were systematically and automatically excluded. In this connection it should be noted that the mere fact that a person earns more than $4 a day would not serve as an excuse. Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear. Thus a blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial. "That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by

---

[4] See statement of Judge John C. Knox in Hearings before the House Committee on the Judiciary, 79th Cong., 1st Sess., on H. R. 3379, H. R. 3380 and H. R. 3381, Serial No. 3, June 12 and 13, 1945, p. 4. ". . . when jurors' compensation is limited to $4 per day, and when their periods of service are often protracted, thousands upon thousands of persons simply cannot afford to serve. To require them to do so is nothing less than the imposition upon them of extreme hardship." *Id.*, p. 8.

one, lead to the irretrievable impairment of substantial liberties." *Glasser* v. *United States, supra*, 86.

It follows that we cannot sanction the method by which the jury panel was formed in this case. The trial court should have granted petitioner's motion to strike the panel. That conclusion requires us to reverse the judgment below in the exercise of our power of supervision over the administration of justice in the federal courts. See *McNabb* v. *United States,* 318 U. S. 332, 340. On that basis it becomes unnecessary to determine whether the petitioner was in any way prejudiced by the wrongful exclusion or whether he was one of the excluded class. See *Glasser* v. *United States, supra; Walter* v. *State,* 208 Ind. 231, 195 N. E. 268; *State ex rel. Passer* v. *County Board,* 171 Minn. 177, 213 N. W. 545. It is likewise immaterial that the jury which actually decided the factual issue in the case was found to contain at least five members of the laboring class. The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of the high standards of jury selection. To reassert those standards, to guard against the subtle undermining of the jury system, requires a new trial by a jury drawn from a panel properly and fairly chosen.

*Reversed.*

Mr. Justice Jackson took no part in the consideration or decision of this case.

Mr. Justice Frankfurter, with whom Mr. Justice Reed concurs, dissenting.

This was a suit brought by the petitioner, a salesman, against the Southern Pacific Company for injuries suffered by him while a passenger on one of the Railroad's trains, and attributed to the Company's negligence. The trial was in the United States District Court sitting in San Francisco. The jury rendered a verdict against the peti-

tioner. The District Court found no ground for setting it aside and entered judgment on the verdict. Upon full review of the trial, the Circuit Court of Appeals for the Ninth Circuit affirmed the judgment. 149 F. 2d 783. Thus, a verdict arrived at by a jury whose judgment on the merits the District Court has found unassailable, which the Circuit Court of Appeals has affirmed on the merits, and which this Court has refused to review on the merits, 326 U. S. 716, is here nullified because of an abstract objection to the manner in which the district judges for the Northern District of California have heretofore generally discharged their duty, with the approval of the reviewing judges of the Ninth Circuit, to secure appropriate jury panels.

The process of justice must of course not be tainted by property prejudice any more than by racial or religious prejudice. The task of guarding against such prejudice devolves upon the district judges, who have the primary responsibility for the selection of jurors, and the circuit judges, whose review of verdicts is normally final. It is embraced in the duty, formulated by the judicial oath, to "administer justice without respect to persons, and do equal right to the poor and to the rich . . ." 1 Stat. 73, 76, 36 Stat. 1087, 1161; 28 U. S. C. § 372. But it is not suggested that the jury was selected so as to bring property prejudice into play in relation to this specific case or type of case, nor is there the basis for contending that the trial judge allowed the selective process to be manipulated in favor of the particular defendant. No such claim is now sustained. Neither is it claimed that the district judges for the Northern District of California, with the approval of the circuit judges, designed racial, religious, social, or economic discrimination to influence the makeup of jury panels, or that such unfair influence infused the selection of the panel, or was reflected in those who were

chosen as jurors in this case. Nor is there any suggestion that the method of selecting the jury in this case was an innovation. What is challenged is a long-standing practice adopted in order to deal with the special hardship which jury service entails for workers paid by the day. What is challenged, in short, is not a covert attempt to benefit the propertied but a practice designed, wisely or unwisely, to relieve the economically least secure from the financial burden which jury service involves under existing circumstances.

No constitutional issue is at stake. The problem is one of judicial administration. The sole question over which the Court divides is whether the established practice in the Northern District of California not to call for jury duty those otherwise qualified but dependent on a daily wage for their livelihood requires reversal of a judgment which is inherently without flaw.

Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. Since the color of a man's skin is unrelated to his fitness as a juror, negroes cannot be excluded from jury service because they are negroes. *E. g., Carter* v. *Texas,* 177 U. S. 442. A group may be excluded for reasons that are relevant not to their fitness but to competing considerations of public interest, as is true of the exclusion of doctors, ministers, lawyers, and the like. *Rawlins* v. *Georgia,* 201 U. S. 638. But the broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility. See *Smith* v. *Texas,* 311 U. S. 128, 130.

Obviously these accepted general considerations must have much leeway in application. In the abstract the Court acknowledges this. "The choice of the means by

which unlawful distinctions and discriminations are to be avoided rests largely in the sound discretion of the trial courts and their officers." Congress has made few inroads upon this discretion. Its chief enactment underlines the importance of avoiding rigidities in the jury system and recognizes that ample play must be allowed the joints of the machinery. The First Judiciary Act adopted for the federal courts the qualifications and exemptions, with all their diversities, prevailing in the States where the federal courts sit. 1 Stat. 73, 88. That has remained the law. 36 Stat. 1087, 1164; 28 U. S. C. § 411. (For a collection of federal statutes regulating the composition and selection of jurors, see 37 Harv. L. Rev. 1010, 1098–1100.) We would hardly have taken this case to consider whether the federal court in San Francisco deviated from the requirements of California law, and nothing turns on that here. But it is not without illumination that under California law all those belonging to this long string of occupations are exempted from jury service: judicial, civil, naval, and military officers of the United States or California; local government officials; attorneys, their clerks, secretaries, and stenographers; ministers; teachers; physicians, dentists, chiropodists, optometrists, and druggists; officers, keepers, and attendants at hospitals or other charitable institutions; officers in attendance at prisons and jails; employees on boats and ships in navigable waters; express agents, mail carriers, employees of telephone and telegraph companies; keepers of ferries or tollgates; national guardsmen and firemen; superintendents, engineers, firemen, brakemen, motormen, or conductors of railroads; practitioners treating the sick by prayer. *California Code of Civil Procedure*, § 200.

Placed in its proper framework the question now before us comes to this: Have the district judges for the Northern District of California, supported by the circuit judges of

the Ninth Circuit, abused their discretion in sanctioning a practice of not calling for jury duty those who are dependent upon a daily wage for their livelihood?

The precise issue must be freed from all atmospheric innuendoes. Not to do so is unfair to the administration of justice, which should be the touchstone for the disposition of the judgment under challenge, and no less unfair to a group of judges of long experience and tested fidelity. If workmen were systematically not drawn for the jury, the practice would be indefensible. But concern over discrimination against wage earners must be put out of the reckoning. Concededly those who are paid weekly or monthly wages were placed on the jury lists. And that no line was drawn against the wage earners because they were wage earners, and that there was merely anticipatory excuse of daily wage earners, is conclusively established by the fact that the wives of such daily wage earners were included in the jury lists. As to any claim of the operation of a designed economic bias in the method of selecting the juries, the Circuit Court of Appeals rightly found "no evidence that the persons whose names were in the box, or the persons whose names were drawn therefrom and who thus became members of the panel, were 'mostly business executives or those having the employer's viewpoint.' " 149 F. 2d 783, 786.

"When the question is narrowed to its proper form the answer does not need much discussion. The nature of the classes excluded was not such as was likely to affect the conduct of the members as jurymen, or to make them act otherwise than those who were drawn would act. The exclusion was not the result of race or class prejudice. It does not even appear that any of the defendants belonged to any of the excluded classes. The ground of omission no doubt was that pointed out by the state court, that the business of the persons omitted was such that either they

would have been entitled to claim exemption or that probably they would have been excused." So this Court speaking through Mr. Justice Holmes answered a related question in *Rawlins* v. *Georgia,* 201 U. S. 638, 640. And the justification for the answer applies to the present situation.

It is difficult to believe that this judgment would have been reversed if the trial judge had excused, one by one, all those wage earners whom the jury commissioner, acting on the practice of trial judges of San Francisco, excluded. For it will hardly be contended that the absence of such daily wage earners from the jury panel removed a group who would act otherwise than workers paid by the week or the wives of the daily wage earners themselves. The exclusion of the daily wage earners does not remove a group who would, in the language of Mr. Justice Holmes, "act otherwise than those who are drawn would act." Judged by the trend of census statistics, laborers paid by the day are not a predominant portion of the workers of the country. See Sixteenth Census of the United States, 1940, Population, Vol. III, The Labor Force, Part 2, pp. 290 *et seq.* It certainly is too large an assumption on which to base judicial action that those workers who are paid by the day have a different outlook psychologically and economically than those who earn weekly wages. In the language of Mr. Chief Justice Hughes, "Impartiality is not a technical conception. It is a state of mind." *United States* v. *Wood,* 299 U. S. 123, 145. And American society is happily not so fragmentized that those who get paid by the day adopt a different social outlook, have a different sense of justice, and a different conception of a juror's responsibility than their fellow workers paid by the week. No doubt the insecurities of a system of daily earnings, or generally of wages on less than an annual basis, raise serious problems as does, of course, also the

question of guaranteed wage plans. See the letter of President Roosevelt to the Director of War Mobilization, James F. Byrnes, on the date of March 20, 1945, carrying out the suggestion of a report to the President by the War Labor Board for the creation of a Commission to study the question of guaranteed wage plans. And see *Basic Steel Case*, 19 W. L. B. 568, 653 *et seq.;* N. W. L. B. Research and Statistics Report No. 25, Guaranteed Employment and Annual Wage Plans (1944). But these are matters quite irrelevant to the problem confronting district judges in dealing with the present plight of daily wage earners when called to serve as jurors and the power of the judges, as a matter of discretion, to excuse such daily wage earners from duty.

For it cannot be denied that jury service by persons dependent upon a daily wage imposes a very real burden. Judge John C. Knox, Senior District Judge of the Southern District of New York, thus described the problem:

". . . when jurors' compensation is limited to $4 per day, and when their periods of service are often protracted, thousands upon thousands of persons simply cannot afford to serve. To require them to do so is nothing less than the imposition upon them of extreme hardship.

"With respect to the item last-mentioned, it is easy to say that jury duty should be regarded as a patriotic service, and that all public-spirited persons should willingly sacrifice pecuniary rewards in the performance of an obligation of citizenship. With that statement I am in full accord, but it does not solve the difficulty. Adequate provision for one's family is the first consideration of most men. And if, with this thought predominant in a man's mind, he is required to perform a public service that means a default of an insurance premium, the sacrifice of a suit of clothes,

or the loss of this [his] job, he will entertain feelings of resentment that will be anything but conducive to the rendition of justice. In other words, persons with a grievance against the Government or who serve under conditions that expose them to self-denial are not likely to have the spiritual contentment and mental detachment that good jurors require." Hearings before H. R. Committee on the Judiciary on H. R. 3379, H. R. 3380, H. R. 3381, 79th Cong., 1st Sess. (1945) 8.

No doubt, in view of the changes in the composition and distribution of our population and the growth of metropolitan areas, a reexamination is due of the operation of the jury system in the federal courts. Just as the federal judicial system has been reorganized and administratively modified through a series of recent enactments (see Act of September 14, 1922, 42 Stat. 837, 838, 28 U. S. C. §§ 218 *et seq.;* Act of February 13, 1925, 43 Stat. 936, 28 U. S. C. §§ 41 *et seq.;* Act of August 7, 1939, 53 Stat. 1223, 28 U. S. C. §§ 444 *et seq.*), the jury system, that indispensable adjunct of the federal courts, calls for review to meet modern conditions. The object is to devise a system that is fairly representative of our variegated population, exacts the obligation of citizenship to share in the administration of justice without operating too harshly upon any section of the community, and is duly regardful of the public interest in matters outside the jury system. This means that the many factors entering into the manner of selection, with appropriate qualifications and exemptions, the length of service and the basis of compensation must be properly balanced. These are essentially problems in administration calling for appropriate standards flexibly adjusted.

Wise answers preclude treatment by rigid legislation or rigid administration. Congress has devised the appro-

priate procedure and instrument for making these difficult and delicate adjustments by its creation, in 1922, of the Conference of Senior Circuit Judges. The Conference, under the presidency of the Chief Justice of the United States, is charged with the duty of continuous oversight of the actual workings of the federal judicial system and of meeting disclosed needs, either through practices formulated by the Conference, or, when legislation is necessary or more appropriate, through proposals submitted to Congress. See 40 Harv. L. Rev. 431. That is precisely the course that has been followed in regard to the inadequacies in the operation of the federal jury system. In September, 1941, the late Chief Justice brought the matter before the Conference. As a result, Mr. Chief Justice Stone appointed a committee of experienced district judges, see Report of the Judicial Conference (1941) 16, under the chairmanship of Judge Knox who, because of the length and richness of his experience in the busiest district of the country, brought unusual equipment for devising appropriate reforms. In September, 1942, the Committee reported, Report to the Judicial Conference of the Committee on Selection of Jurors (1942) 1, and submitted proposals for legislation. *Id.* at 44, 62, 107. Bills to carry out these recommendations were introduced in the Senate on January 11, 1944, S. 1623, 1624, 1625, 78th Cong., 2d Sess., and in the House on June 5, 1945, H. R. 3379, 3380, 3381, 79th Cong., 1st Sess. Hearings were had upon the House Bills on June 12 and 13, 1945, and action on them is now pending.

The Court now deals by adjudication with one phase of an organic problem and does so by nullifying a judgment which, on the record, was wholly unaffected by difficulties inherent in a situation that calls for comprehensive treatment, both legislative and administrative. If it be suggested that until there is legislation this decision will be

the means of encouraging the district judges to uncover a better answer than they have thus far given to a lively problem, an appropriate admonition from the Court would accomplish the same result, or common action regarding the practice now under review may be secured from the Conference of Senior Circuit Judges. To reverse a judgment free from intrinsic infirmity and perhaps to put in question other judgments based on verdicts that resulted from the same method of selecting juries, reminds too much of burning the barn in order to roast the pig.

I would affirm the judgment.