## McGee v. State.

(In Banc. February 9, 1948.)

[33 So. (2d) 843. No. 36411.]

See also 26 So. (2d) 680.

**Dixon L. Pyles** and **Dan E. Breland,** both of Jackson, for appellant.

594

596

**Greek L. Rice,** Attorney General, by **R. O. Arrington,** Assistant Attorney General, for appellee.

598

**Sydney Smith, C. J.**, delivered the opinion of the court.

The appellant, a Negro, was convicted of rape. The crime was committed in Jones County and the indictment on which the appellant was tried was returned by a grand jury of the Circuit Court of that county, but on a motion for a change of venue the case was transferred to the Circuit Court of Forrest County, where it was tried on its merits. Before the transfer of the case to Forrest County the Circuit Court of Jones County overruled a motion to quash the indictment, the motion alleging, in effect, that there were no Negros on the grand jury which indicted the appellant and were excluded therefrom. because of their race, thereby violating the appellant's right to equal protection of the laws guaranteed to him by the Fourteenth Amendment to our national Constitution. It has been definitely settled by the Supreme Court of the United States in Patton v. Mississippi, 68 S. Ct. 184, 185, 92 L. Ed.—, and the cases cited in footnotes to the opinion there rendered, with which Court lies the final decision of all judicial questions arising under our national Constitution, that:

(1) The "exclusion of Negroes from grand and petit juries solely because of their race denied Negro defendants in criminal cases the equal protection of the laws required by the Fourteenth Amendment. . . . regardless of whether the discrimination was embodied in statute or was apparent from the administrative practices of state jury selection officials."

(2) The "fact that no Negro had served on a criminal court grand or petit jury for" a long period of time "created a very strong showing that during that period Negroes were systematically excluded from jury service because of race."

(3) "When such a showing was made, it became a duty of the State to try to justify such an exclusion as having been brought about for some reason other than racial discrimination."

(4) Evidence by the public officials charged with the duty of selecting the list from which grand and petit juries are to be drawn that they did not exclude Negroes from such list because of their race, unless corroborated by public records or other substantial evidence, does not meet this burden of proof.

The evidence here discloses that no Negroes were on the grand jury that indicted the appellant and that no Negroes had served on the grand and petit juries of Jones County for a long number of years, if ever, although there were at all times in the county Negroes, though few in number, who were qualified for jury service. Practically all of the evidence relied on by the State to meet its burden of showing that Negroes were not excluded from the jury list because of race is the testimony of members of the Board of Supervisors who prepared the jury lists that they did not exclude Negroes therefrom because of their race but put the names of persons on the list who were qualified for jury service without knowing whether they were members of the white or Negro race. It follows, therefore, unless we are to disregard the decisions of the Supreme Court of the United States, which we are without the right to do, we must hold that the Circuit Court of Jones County erred in not quashing this indictment, and consequently must reverse the judgment rendered by the Circuit Court of Forrest County on the trial of the case on its merits and remand the case to that Court

for further proceedings not inconsistent with this opinion.

Reversed and remanded.

**McGehee, J.,** delivered a dissenting opinion.

As shown by the majority opinion herein, this case is being reversed for a third trial because of what was said about racial discrimination in the selection of jurors in the opinion of the Supreme Court of the United States, written by Mr. Justice Black on December 8, 1947, 68 S. Ct. 184, 187, in the case of Eddie (Buster) Patton v. State of Mississippi, and on the former decisions of that Court therein cited and adopted as if controlling in the Patton case; and the reversal in the case now before us is for that reason alone.

In the Patton case it was held that the State had "wholly failed to meet the very strong evidence of purposeful racial discrimination made out by the petitioner upon the uncontradicted showing that for thirty years or more no Negro had served as a juror in the criminal courts of Lauderdale County." That this "key" fact created a strong showing that during that period of thirty years Negroes were systematically excluded from jury service because of race, and that the state was required to meet that showing or presumption by proof. In so holding the Court conceded, however, that: "Whether there has been systematic racial discrimnation by administrative officials in the selection of jurors is a question to be determined from the facts in each particular case." Then, notwithstanding the concession last above quoted, the Court said that we had "regarded as irrelevant the key fact that for thirty years or more (prior to the selection of the jurors in that case) no Negro has served (in other cases) on the grand and petit juries." That our failure to consider this key fact "seriously detracts from the weight and respect" that the court would otherwise give to our conclusions in reviewing the facts of that case. Of

course I am concerned as to what degree of "weight and respect" is to be given by other courts to our decisions, but I think it is of far more serious consequence that our decisions should be based upon the facts of each particular case, instead of what may have happened in former years in other cases.

But, be that as it may, I am agreeable to the remand of the Patton case to the Circuit Court of Lauderdale County for a new trial for the sufficient reason that we are bound to obey the mandate of the Supreme Court of the United States issued therein, although I am unable to see how the "key" fact that no Negroes have served on the juries in that county in the past thirty years is to be obviated when the case is again called for retrial. How we are to make the transition required by the implications of the opinion of the Court in that case, unless the facts of a particular case are to control, is not explained. But, nevertheless, I am of the opinion, after a most careful examination and study of the evidence taken in the trial court on the issue of racial discrimination in the case at bar, that what transpired in the case now before us makes it readily distinguishable from the Patton case.

In the first place, the motion to quash the grand jury panel in the Patton case was timely made, as observed by this Court and the Supreme Court of the United States in the opinions therein rendered; whereas, in the case now before us the validity of said jury panel was not challenged on the first trial of this case or on the former appeal herein. In fact such a question must be raised, if at all, and the proof taken thereon in the trial court. An orderly procedure in the trial of capital felony cases requires that motions to quash the indictment should be presented before a special venire is drawn and summoned to court for the trial, to the end that great expense and delay be avoided, although the same could be presented later and at any time before the trial begins on the merits where a constitutional right is involved.

In the second place, we reversed this case on the former appeal, McGee v. State, 200 Miss. 350, 26 So. (2d) 680, at the instance of the accused to the end that he could be tried in another county under this indictment on a change of venue, notwithstanding that considerable expense had been incurred to Jones County on the first trial, without any question having been raised in regard to whether or not the names of any Negroes had been placed in the jury box or drawn on the grand jury.

In the third place, after the motion to quash the indictment had been filed for the first time shortly before the second trial and was overruled, the case was transferred to Forrest County for trial, and a motion filed to quash the special venire of petit jurors, drawn of course from the jury box in that county, and no question was raised in that county as to whether there had been any discrimination against Negroes in the selection of names for the jury box or in the drawing of such venire. If, therefore, the accused was tried before an ''all-white'' petit jury, as was also emphasized in the Patton case, he is in no position to now complain in regard thereto.

In the fourth place, and this fact should be controlling even under the decision in the Patton case, the accused disproved by his own and most material witnesses, the Circuit and Chancery Clerks and all of the members of the Board of Supervisors, that there had been no intentional and systematic exclusion of Negroes from the jury box by the members of said Board whose duty it is to select and place in the box the names of a sufficient number of male qualified electors who are likewise qualified for jury service, as will be shown by their testimony hereinafter quoted.

And it is to be assumed that it is still permissible for any court in the land to hold that a party introducing witnesses is bound by their testimony, unless they be adversary litigants introduced under a special statutory authority with the right to contradict them, or unless the party introducing them is able to plead surprise at their

testimony. Neither of these exceptions is applicable here, nor were they contradicted by other witnesses.

The Circuit Clerk and the members of the Board of Supervisors, were the only persons who were in position to know, or claimed to know, what actually occurred in the selection of the names of jurors which were placed on the list in April 1945 and which were thereupon placed in the jury box, out of which this grand jury was later drawn on December 3, 1945.

The Circuit Clerk testified at the hearing on this motion in October 1946 that she believed that there were about 90 Negroes *registered* on the poll books in Jones County, where the indictment was returned. She was not asked as to the number of such registered Negroes who were qualified as electors either to vote or for jury service when the jury box was filled in April 1945, or when the grand jury was drawn in December 1945. It is clear from her testimony that she had reference to the number of those *registered* in October 1946, that is to say, at the time she was testifying. Of course, there is a vital difference between merely being registered on the poll books and being either a qualified elector or juror.

The Chancery Clerk, a witness offered by the accused, as aforesaid, testified that there were from 8,000 to 10,000 qualified electors in Jones County and that 75 or more of the 90 registered Negroes, also estimated by the Circuit Clerk as the approximate number of those registered in October 1946, had registered ''since the last election,'' and explained that he referred to the election in 1946. He further testified that ''up until then, I don't know of but 4 or 5.'' And it is a matter of common knowledge in this State that there was a marked increase in the registration of Negroes in 1946, on account of the fact that a United States Senator was a candidate for re-election, as an ardent advocate of white supremacy, and also because of the influence of northern agitators who want to win the favor of the Negro vote in the national election and in the local elections in the northern states.

Before quoting the testimony of the Supervisors, it should be now stated that it was further shown by the uncontradicted testimony of a witness for the State, who had served about seven years in the office of the Circuit Clerk, the custodian of the poll books, that out of the estimated number of 90 Negroes registered at the time of the hearing, at least 70 of them were registered during the year 1946. He was asked this question: "Tell the Court about how many of that 90 qualified this year," and he answered, "I would say at least 70 of them." That would leave approximately 20 Negroes who were registered to vote when the jury box was filled in April 1945 and later when the grand jury was drawn in December 1945, and the record before us is silent as to how many of those, if any, were qualified for jury service. It was a part of the burden of the accused to prove in support of his motion, so as to make out a prima facie case of intentional discrimination, that there were Negroes qualified for jury service when the jury box was filled. Therefore, the conclusion is inescapable that it would have been only a mere possibility that a Negro qualified for jury service could have been drawn on this grand jury, the members of which panel *were drawn from the jury box by chance*, as required by law, and especially did this improbability exist when it is considered that there were from 8,000 to 10,000 qualified in the county. Therefore, it will be readily seen that the complaint about no Negroes being on the grand jury which indicted the appellant is "Much Ado About Nothing."

In this connection, let us now see what was testified to by the five members of the Board of Supervisors who were introduced as witnesses at the hearing by the accused, as aforesaid. The member of the Board from Supervisors District No. 1 testified under oath that "I just took a list of qualifiied electors—that was, that I thought were, and then got the clerk to help me check them, and whether they were colored or white I didn't know, sir." He was then asked, "In your experience have you ever

seen a Negro serve on this jury," and he answered "No, sir, I have never seen any, *but I know that we have Negro names in the box.*" (Italics mine.) He was further asked, "Do you know, sir whether or not you have any qualified Negro electors in your particular District," and his answer was, "Personally, I don't know, no, sir." He further testified, "I figure all qualified electors are subject to call" (meaning of course male electors), and he was later asked, "So far as you know you took them as they came, and placed them in the jury box for service, as qualified electors, whether they were white or black," and he answered, "That's right."

The Supervisor from District 2, as a witness for the accused, was asked if there were any Negro qualified electors in his District, and he answered, "Well, there are now, but there wasn't a year ago, (when the grand jury was drawn) I don't think." He was then asked, "Do you know whether or not there were any in April 1945 when you drew the list of jurors." His answer was: "No, I don't think—there wasn't any qualified, I don't think." And this further question was asked, "If they want to qualify, they have the right to do it, but they haven't qualified in your Beat so far as you know," and his answer was "That's right."

The Supervisor of District 3 was asked, "Do you have any Negro qualified electors in your District," and he answered, "If I do I don't know it."

The Supervisor from District 4 was asked, "Were any Negroes drawn on that jury list at that time," and his answer was, "I do not know."

The Supervisor from District 5 was asked, "Do you have any qualified Negro electors in Beat 5," and upon objection made on the ground that on account of there being two separate judicial court districts in the county, which are treated as two separate counties for the drawing of jurors, and that his District was not in the Court district where this grand jury was drawn, he was not permitted to answer the question.

Therefore, it is pertinent to ask this question: How could the members of the Board of Supervisors have intentionally discriminated against Negroes qualified for jury service if they did not know whether or not any of them in their respective Districts were both registered and qualified for such service?

There was proof offered by the State that there were between 12,000 and 13,000 names registered on the poll books, and the proof on behalf of the accused disclosed that from 8,000 to 10,000 of them were qualified electors. And it was shown that the jury list was selected from the poll books, and in the selection of the names of men of "fair intelligence, sound judgment and good character" for jury service, as required by statute, there are many who are registered on these books, both white and colored whom the members of the Board of Supervisors are justified in not placing thereon in the exercise of the discretion vested in them by law. Jury competence is an individual matter, and it was held by the Supreme Court of the United States in Thiel v. Southern Pacific Co., 328 U. S. 217, 66 S. Ct. 984, 986, 90 L. Ed. 1181, 166 A. L. R. 1412, involving the question of discrimination against a class in the selection of names for jury service, that "the choice of the means by which unlawful distinctions and discriminations are to be avoided rests largely in the sound discretion of the trial courts and their officers." That case was decided in October 1945, before this grand jury was drawn in December of that year.

The State introduced, among other witnesses, Mr. G. W. Hosey, who had previously served as county Prosecuting Attorney, District Attorney, and Mayor of the City of Laurel, one of our largest municipalities, and he was asked whether or not he had "ever observed that a Negro has been called for jury service—or Negroes". And his answer was "Yes, Mr. Pittman (the State's attorney in the instant case), I have known of Negroes being in the jury box. Q. In this County—in this County, and in this District? A. Yes, in this District. I couldn't tell you

what years, but I have known them to be drawn,. but they never did serve as jurors, and if you want me to give you the reason why I can do that. Q. Well, I will ask you whether or not the Court excused them or whether they asked to be excused themselves? A. We have always had in this County about 35 to 50 Negroes that were qualified electors, up until this year. They were the better class of Negroes and when they were drawn for jury service, and even in Federal court at Meridian, I don't know now about Hattiesburg, they would ask to be excused." It developed later in his testimony that in saying we have had about 35 or 40 he had reference to the years 1927 to 1933, inclusive, while he was District Attorney, although he was not sure about it.

At any rate, if there was any substantial conflict in the evidence offered on both sides on the motion to quash the indictment, it was the province and duty of the trial judge to decide such conflict therein on this preliminary motion in advance of the trial by the jury, and it is well settled by all of the decisions of this Court, and in every other jurisdiction, both federal and state, that the decision of a trial judge upon an issue of fact which he is called upon to decide should be affirmed by the appellate-courts unless such decision in manifestly wrong or without support of substantial evidence.

Moreover, this record discloses that the accused was tried by a jury in Forrest County drawn from a special venire drawn from the jury box of that county after the change of venue had been granted on remand of the cause, and the question of whether or not there were names of Negroes in the jury box or drawn therefrom for jury service in this case, was not raised in the motion to quash that special venire, but said motion was on entirely different grounds. In other words, the question of whether or not the accused had a constitutional trial and conviction in Forrest County from which this appeal is taken is not questioned. Therefore, if he was tried by an all-white petit jury he is not in position to complain in

regard thereto. Hence, the question of whether or not there was any racial discrimination in the selection of the jury which returned the verdict appealed from, is not before this Court.

And, now recurring to the question raised in Jones County after a remand of the case and before the change of venue was granted, the motion to quash the indictment assumes that there were names of the members of the Negro race in the jury box when the grand jury was drawn therefrom, the said assumption being in the following language, to-wit: "That the said names of the members of the Negro race which are listed in the jury box are systematically excluded from the drawing of all of said jury panels". Moreover, the uncontradicted testimony of the Supervisor from District 1, hereinbefore quoted, shows that there were names of Negroes in the jury box. And unless and until our statutes which require the members of the grand and petit juries to be drawn from the jury box by chance are first held unconstitutional, they cannot be handpicked in order to guarantee the placing of Negroes on these panels. Unless the names had been drawn otherwise than by chance in the instant case, the possibility of any of the few Negroes qualified for jury service out of the 20 registered, as compared with the 10,000 to 12,000 other electors would have been too remote to justify a finding that they were discriminated against when the hand of the drawing official was reached into the box in the presence of the trial judge for names of persons to be impaneled on the grand jury, on the opening day of the court.

In the case of Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84, there were as many as ten per cent of the qualified Negro jurors, and therefore a reasonable possibility that if a fair proportion of them, in comparison to white qualified jurors, had been placed in the box some of them may have been drawn. That case is not therefore controlling under the facts proved by the accused in the case at bar.

In the language of Mr. Justice Frankfurter in the case of Thiel v. Southern Pacific Co., hereinbefore cited, it was correctly announced that: "To reverse a judgment free from intrinsic infirmity and perhaps to put in question other judgments based on verdicts that resulted from the same method of selecting juries (as in that particular case), reminds too much of burning the barn in order to roast the pig."

Since we are merely an intermediate court when there is involved a question of whether or not the rights of an accused have been violated under the Federal Constitution, I think that under the facts of this particular case the conviction should be affirmed, leaving the defendant to his remedy of an appeal to the court of final jurisdiction, and in the event that court should affirm the conviction, which in my opinion it should do, the county will be spared the cost of a third expensive trial.

**Roberts, J.,** concurs in this dissent.