Craig Wayne SEUBERT, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–86–00057–CR, 01–87–00059–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

April 11, 1988.

J. Brent Liedtke, Humble, for appellant.

Michael J. Guarino, Crim. Dist. Atty., Susan W. Burris, Asst. Dist. Atty., Galveston, for appellee.

Before EVANS, C.J., and COHEN and HOYT, JJ.

## OPINION

COHEN, Justice.

In a joint trial, appellant was found guilty of aggravated sexual assault and attempted aggravated kidnapping, and the jury assessed punishment of 40 years imprisonment for the former offense and five years for the latter.

Appellant, who is white, contends that the trial court erred in denying his motion to dismiss the jury because at least one black venire member was peremptorily struck by the prosecutor solely on the basis of race. The State contends that a white defendant lacks standing to complain that black venire members were struck on the basis of race.

Appellant moved to dismiss the jury and for a mistrial after the State rested at the guilt/innocence stage. For cases tried before *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was decided, as was this one, such a challenge is

considered timely. *Henry v. State,* 729 S.W.2d 732, 736 (Tex.Crim.App.1987).

No statement of facts of the jury selection proceedings is before us. However, the prosecutor testified that she struck three of the four blacks on the venire. The fourth black venire member, a Texas Department of Corrections guard, served as a juror. The prosecutor testified that she struck black venire member J.B. Spencer because he was "very unresponsive" to her questions, had difficulty understanding them, required them to be explained repeatedly, stated several times that he did not know if he could perform jury service, and because he was unmarried, she assumed that he would be less sympathetic toward sexual assault victims. The prosecutor admitted that she did not strike each member of the panel who had no wife or daughter.

The prosecutor struck black venire member Eleanor S. James because she was having great difficulty staying awake. Although the prosecutor did not inquire, she thought that James, a housekeeper at John Sealy Hospital, might be a night worker and have to miss work because of jury duty. The prosecutor also testified that she struck James because James had a 23–year–old son, approximately the age of appellant. The prosecutor admitted that she did not strike every worker who would miss work for jury duty and that she did not strike every venire member who had children near the age of appellant.

Concerning her peremptory strike of black venireman Kenneth Oliver, the prosecutor testified as follows:

Q. Can you give the court any reason other than race why you challenged peremptorily Kenneth Oliver?

A. Yes. Mr. Oliver was the thirty-fourth juror originally. And by the time we got around to consulting with Mr. Oliver, as I recall, the reason we put him in was because one of the jurors at the very last moment got up and said that he couldn't be a part of the panel. We inserted Mr. Oliver and I asked him no questions individually at all, neither one

of us. I didn't know much about him. Period.

Q. Did you petition the court for time to question Mr. Oliver because he was just coming on the panel.

A. No, I didn't. It was late.

Q. It was late and he was black, and you challenged him?

A. I challenged him.

The jury list shows that Oliver was inserted as number 22, in place of another venire member who was apparently excused for cause.

The record reflects that Kenneth Oliver was black; that the State knew he was black; that he was peremptorily struck by the State; that no questions were asked of Oliver; that the prosecutor did not seek to ask any questions of Oliver; and that Oliver was not struck based on anything the prosecutor knew about him. The record reflects that the prosecutor knew nothing about Oliver except his race.

Both appellant and the State rely on *Batson.* The State argues that *Batson* applies only when the State has struck venire members of the defendant's race; thus, because appellant is white and those struck are black, appellant has no standing to complain. We disagree.

In *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), the court wrote:

We hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law.

407 U.S. at 504, 92 S.Ct. at 2169.

The court granted post-conviction habeas corpus relief to a white Georgia prisoner because blacks were excluded from his venire. The court rejected the argument that a white defendant could not appeal the improper exclusion of black venire members. The court held:

The ... unconstitutional state action occur(s) whether the defendant is white or Negro, whether he is acquitted or convicted. In short, when a ... jury has

been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim. ...

407 U.S. at 498, 92 S.Ct. at 2166.

Moreover, ... the exclusion of a discernable class from jury service injures not only those defendants who belong to the excluded class, but other defendants as well, in that it destroys the possibility that the jury will reflect a representative cross section of the community. ...

407 U.S. at 500, 92 S.Ct. at 2167.

Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well. ...

407 U.S. at 502–03, 92 S.Ct. at 2168.

[W]e are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.

407 U.S. at 503, 92 S.Ct. at 2169.

The court concluded:

In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few.

407 U.S. at 504, 92 S.Ct. at 2169.

In sum, "the exclusion of Negroes from jury service, like the arbitrary exclusion of any other well-defined class of citizens, offends a number of related constitutional values." 407 U.S. at 498, 92 S.Ct. at 2166. Such exclusion denies equal protection of the law to defendants who belong to the excluded class, *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 308–09, 25 L.Ed. 664 (1880); stigmatizes the excluded group by denying its privileges of citizenship, *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1880) (upholding a state judge's federal criminal conviction for excluding blacks from grand and petit juries; *see* 18 U.S.C. § 243 (1969)); and "cast[s] doubt on the integrity of the whole judicial process" by "destroy[ing] the possibility that the jury will reflect a representative cross section of the community." *Peters,* 407 U.S. at 500, 502, 92 S.Ct. at 2167, 2168.

The rule that a party need not belong to an excluded group in order to challenge that group's exclusion from jury service has been repeatedly applied, both before and after the decision in *Peters v. Kiff.* Thus, men can challenge the systematic exclusion of women from juries, *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and from grand juries. *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). The rule has been applied in a civil case to prohibit the automatic exclusion of daily wage earners, without determining whether the appellant was one or whether he was prejudiced by the wrongful exclusion, and even though the jury that heard the case had at least five members of "the laboring class." *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 225, 66 S.Ct. 984, 988, 90 L.Ed. 1181 (1946). The cases cited have found that standing existed in civil and criminal cases; in state and federal cases; and based on federal constitutional law, federal statutory law, and federal common law.

■ No defendant, white or black, has a right to be judged by jurors of any particular race. *Strauder v. West Virginia.* However, every defendant, white and black, has the right not to have the State deny him the opportunity to be judged by a jury representative of the entire community. *Martin v. Texas,* 200 U.S. 316, 321, 26 S.Ct. 338, 339, 50 L.Ed. 497 (1906). The rule that protected a white man in *Peters v. Kiff* is "inseparable" from that which protected a black man in *Batson. See Lindsey v. Smith,* 820 F.2d 1137, 1145–46 (11th Cir.1987).

We hold that appellant has standing to complain.

*Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), plainly recognized the right here in issue, but placed an impossible burden on defendants to prove a violation. "All *Batson* did was give defendants a means of enforcing this prohibition." *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 2883, 92 L.Ed.2d 199 (1986) (Marshall, J., dissenting). *Batson* created a new remedy, not a new right. *Batson* requires the defendant to show that he belonged to the excluded class. This is a reasonable requirement for a defendant claiming denial of equal protection on the basis of race, and *Batson* was squarely grounded on the equal protection clause of the 14th Amendment. This was the narrowest basis on which to decide *Batson* because the defendant there was black. However, as the Supreme Court observed in *Peters v. Kiff,*

> Because each of these three cases (*Strauder v. West Virginia, Virginia v. Rives,* [100 U.S. (10 Otto) 313, 25 L.Ed. 667], and *Ex parte Virginia* ) was amenable to decision on the narrow basis of an analysis of the Negro defendant's right to equal protection, the Court brought all three under that single analytical umbrella.
>
> But even in 1880, the Court recognized that other constitutional values were implicated.

407 U.S. at 499, 92 S.Ct. at 2167.

Appellant is white; therefore, he was not denied equal protection when Mr. Oliver was struck. He cannot meet that requirement of *Batson,* but he need not do so because he also asserts a denial of due process of law, *see Peters v. Kiff,* and a Sixth Amendment violation, *see Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975). *Batson* established a remedy for black defendants claiming denial of equal protection. To apply its "same race" or "membership" requirement to deny relief in this case would require us to ignore contrary holdings in *Peters v. Kiff, Taylor v. Louisiana,*

*Ballard v. United States,* and *Thiel v. Southern Pac. Co.* We decline to do so.

■ *Batson* nevertheless guides our decision. Except for the same race requirement that is irrelevant in reviewing Sixth Amendment and due process claims, *Batson* is a practical model to follow in this case.

The *Batson* procedure was followed here. The prosecutor was challenged concerning her decision to strike Mr. Oliver; she knew nothing of him except his race; she struck him without questioning him or seeking to question him; she gave no racially neutral reason for striking him. *Batson* requires more than silence to justify the State's peremptory strike of a black venire member. We conclude that appellant made a prima facie showing of racial discrimination in the striking of venireman Oliver, and the State did not rebut that inference.

■ Such error may sometimes be harmless. For example, if the State had shown, or we could judicially notice, that despite the State's peremptory challenges, blacks were not significantly underrepresented on the jury compared to their percentage in the group from which the venire was drawn, there would be no harm. This is because the State's action would not have deprived appellant of a representative jury. This was the holding in *Roman v. Abrams,* 822 F.2d 214, 229 (2d Cir.1987).[1] Thus, while a "representative" jury is never required, its selection can show that State action did not cause the loss of a constitutional right. Unfortunately, the record before us does not show that the error was harmless.

We hold that *Peters v. Kiff* gives a white defendant the right to challenge the State's peremptory strike of a black venire member; that under *Batson,* the State was required to make a racially neutral explanation for striking Mr. Oliver; that the record does not rebut the inference that the State

---

**1.** *Roman* made three important holdings: (1) that such error may be harmless given the ultimate composition of the jury; (2) that the white defendant could complain of the State's peremptory strikes against white venire members; and (3) that the defendant was partly responsible for any harm because he struck two white venire members who were not challenged by the State.

struck Oliver because he was black; and that the error has not been shown to be harmless by evidence that the jury selected was fairly representative.

The first point of error is sustained.[2]

The judgment is reversed, and the cause is remanded to the district court.

HOYT, J., concurs with opinion.

HOYT, Justice, concurring.

I concur in the majority's disposition of this case, but conclude that this case raises additional issues that the majority has failed to address. Specifically, the majority would accept non-racial explanations by the State as sufficient to rebut an otherwise *prima facie* case of racial discrimination in jury selection cases.

In *Batson* cases, I view the duty of the appellate courts as requiring a review of the entire jury selection record to determine if the trial judge properly evaluated the evidence. This does not require formulation of a new standard. We have followed a similar procedure in reviewing appeals from denials of motions to suppress evidence involving the issue of voluntariness of a confession. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

To begin this process, a trial judge has a duty to examine and evaluate the State's explanation using a three-part test: First, the trial judge must determine whether the explanation is facially adequate; second, whether the explanation is refuted by the record; and finally, if both prior questions are resolved in the affirmative and negative, respectively, his decision turns on the credibility of the witnesses. *See Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct.App.1987). An appellate court evaluates the trial court's findings and conclusions following this three-pronged test keeping in mind that the first two prongs require evaluation as questions of law. In essence, whether the explanation is facially adequate or refuted by the record is a question of law.

I will first discuss the question of the facial adequacy of the State's explanation because it is the area posing the most problems. When the State gives its explanation, a trial court cannot view its role as simply evaluating the evidence from a believability standard. Simply concluding that the State's response is racially neutral and that the State intended no harm are inappropriate conclusions. This approach overlooks the first part of the evaluation process and permits the third area, concerning the credibility of the State's response, to predominate the evaluation. A prosecutor may not rebut a defendant's prima facie case merely by denying a discriminatory motivation, or by affirming his good faith in individual selections. It is incumbent upon the prosecutor to articulate a clear and reasonably specific *neutral explanation related to the particular case to be tried. Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) (Emphasis added).

An explanation is facially adequate if after its examination, an inference of bias on the part of the *juror* relative to the law, the case, the parties, the attorneys, or the subject matter can be discerned. This is to say that a venireperson must express a trait or characteristic peculiar to him that may otherwise prejudice or color his reasoning, thereby preventing him from following the law and instructions in the case. In short, the bias must be the individual bias of the venireperson; not a group bias or that of the prosecutor. *People v. Turner*, 42 Cal.3d 711, 230 Cal.Rptr. 656, 726 P.2d 102 (1986). A prosecutor's reliance upon "intuitions" or "gut-feelings" in excluding jurors is no more than a use of colloquial euphemism constituting the very same impermissible group bias outlawed. *Batson*, 106 S.Ct. at 1723. Moreover, failing to ask blacks venire questions before striking them also suggests an impermissible bias. *Turner*, 726 P.2d at 111. Similarly, explanations of what the venireperson was wearing, his demeanor, and his

2. We have examined the remaining points of error and found them to be without merit for the reasons stated in the State's appellate brief.

body language, border on being euphemisms for improper racial stereotyping.

With these legal parameters in mind, I will turn now to the specific responses made by the State in response to the appellant's objection. After the peremptory strikes had been exercised, the defense counsel called the prosecutor to the stand and adduced the following testimony relating to the striking of three black venirepersons from the petit jury:

Q. Can you give the Court any justification other than racial grounds for challenging J.S. Spencer?

A. Yes, sir, I can. When I was interviewing Mr. Spender [sic] on Voir Dire, I felt that he was very unresponsive [sic] to my questions. I had to explain questions over and over to him. He stated several times that he really didn't know if he could do jury service or not. I felt that he had great difficulty understanding my questions.

Further, his jury card indicated to me that he had no wife and no doubt, I felt that he would be unsuitable as a juror for that reason, and that he could not have an understanding of the terror of the victims that I was representing.

Q. Did you challenge preemptively [sic] every member of the panel who had no wife and no daughter?

A. No. I did not. I challenged them each on individual reasons.

Q. Can you state any reason other than race for challenging Elnora S. James?

A. Yes. Mrs. James, as I recall, looked extremely tired and was having real difficulty, it appeared to me, keeping awake. And I noted on that card that she was employed as a housekeeper at John Sealy which I know sometimes has shift work, and I thought she might be a night worker where she would have to work at night and have to come to Court in the daytime. I didn't ask her, but I felt she couldn't follow things. I had some concern that was the only job that she might have and would possibly have to take off and miss work.

Q. Did you challenge every worker who worked and who would have to take off their job to come to Court for jury service?

A. No. I am sure a lot of people have to take off from their jobs. I remember her because she looked so tired and it appeared to be that she had a hard time trying to keep awake.

Another reason I challenged her, she listed the ages of her children. She had six children and one was a 23 year-old male. I felt this was very similar to the defendant's age.

Q. Did you preemptorily [sic] challenge every individual from the panel who had children the age of Craig Wayne Seubert?

A. I am not sure if I struck every one of them, but I did try to discuss with each one of them the ages of their children. It was a factor whether or not they had children and grown children, and whether they were of that age, was.

And to answer your question, no, I probably did not. I considered each one individual juror.

Q. Can you give the Court any reason other than race why you challenged preemptorily, [sic] Kenneth Oliver?

A. Yes. Mr. Oliver was the 34th juror originally. And by the time we got around to consulting with Mr. Oliver, as I recall the, reason we put him in was because one of the jurors at the very last moment got up and said he couldn't be a part of the panel. We inserted Mr. Oliver and I asked him no questions individually at all, neither one of us. I didn't know much about him. Period.

Q. Did you petition the court for time to question Mr. Oliver because he was just coming on the panel?

A. No, I didn't. It was late.

Q. It was late and he was black, and you challenged him?

A. I challenged him.

Q. You are saying it was late and he was black and those might be your reasons for challenging somebody?

A. No, sir, I was only—

Q. He is black, isn't he?

A. As far as I recall.

    *     *     *     *     *     *

Q. Is it true or not true that every black member of the panel was challenged preemptively [sic] by the State with the exception of Mr. Leroy Cooper, who is a Texas Department of Corrections Guard?

A. He is seated on the jury. That's correct.

Q. And he is the only black that was not challenged preemptorily, [sic] correct?

A. Correct.

A careful analysis of the reasons put forth by the prosecutor for striking black venirepersons indicates that the traits or characteristics that were fatal to venirepersons who were black were not fatal to venirepersons who were white. The State struck venireperson Elnora James because one of her children was in the same age bracket as the appellant. However, the prosecutor readily admitted that she did not strike any white venireperson for that reason, although some had that defect. According to her, it was simply a "factor."

Another trait fatal to venireperson James was that the State assumed, without asking, that she was a night-shift worker and that "that was the only job that she might have and would possibly have to take off and miss work." Notably, the State did not offer this trait, although admittedly an assumption, as fatal for white venirepersons. This remark suggests yet another impermissible group bias behind the State's challenge, i.e., working-class bias. *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985–86; *Batson*, 106 S.Ct. at 1723; *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981).

It is my conclusion that each trait or characteristic that the State offered as fatal to venireperson James, admittedly, was not a trait or characteristic peculiar to her, but reflected the bias of the State. Additionally, none of the reasons stated as a basis for striking venireperson James was fatal to venirepersons who were white. More importantly, the reasons for striking venireperson James did not relate to the

case at bar, the parties on trial, or the law of the case.

It is also clear, after examining the reason for striking Mr. Spencer and Mr. Oliver, that the stated reasons given had no relationship to the case, or were refuted by the State's explanation and the record. What is strikingly apparent in this record is the fact that the prosecutor used her subjective state of mind to eliminate prospective jurors. A decision is subjective if it reflects the state of mind or feelings or temperament of the person making the decision, rather than the nature or character of the person being observed. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Our method of jury selection as adopted is obviously designed to permit discrimination by those attorneys who wish to discriminate; however, to the extent that a defendant's sixth amendment and 14th amendment rights to a fair trial and to have a jury chosen from a representative cross-section of the community are violated, the practice is wrong.

For these additional reasons I concur in the majority's opinion.