## MILDRED WILLIAMS *v.* JOHN COPPOLA

| SUPERIOR COURT | JUDICIAL DISTRICT OF NEW HAVEN | FILE NO. 190286 |

Memorandum filed December 10, 1986

*Pittman & Swaine,* for the plaintiff.

*Robert Avery* and *Cella & McKeon,* for the defendant.

BERDON, J. Before the court is the motion by the plaintiff, Mildred Williams, to set aside a jury verdict in favor of the defendant, John Coppola, for the reason that the defendant used his peremptory challenges in violation of the state and federal constitutions by striking from the jury panel every black person who was not excused for cause. This civil case was brought

by the plaintiff, Mildred Williams, a black person, seeking damages against the defendant, John Coppola, a white person, for injuries she sustained as a result of an automobile accident. The plaintiff and the defendant were the operators of the automobiles involved in a collision which occurred on Dixwell Avenue in Hamden on February 12, 1979. The defendant denied liability and filed a special defense alleging that the plaintiff's contributory negligence was the cause of the collision.

The plaintiff seeks to set aside the jury verdict and seeks a new trial under the provisions of the state constitution guaranteeing the rights to trial by a jury; art. I, § 19; and to equal protection; art. I, §§ 1 and 20; and under the federal constitutional right to equal protection, the fourteenth amendment. The court concludes that the plaintiff's state constitutional right to a trial by jury[1] was violated because there was a substantial likelihood the defendant exercised his peremptory challenges solely on the basis of race. In view of this conclusion, the court will not review the plaintiff's remaining constitutional claims. It should be noted, however, that the plaintiff makes a strong showing that her state and federal equal protection rights have been violated.[2] See *Clark* v. *Bridgeport,* 645 F. Sup. 890 (D. Conn. 1986).

---

[1] In making a determination under the state constitution, the court must interpret that constitution independent of the United States constitution when required to do so by its text, history, tradition and intent. *State* v. *Kimbro,* 197 Conn. 219, 234–35, 496 A.2d 498 (1985). Of course, in doing so, the court cannot afford any lesser protection than that to which a comparable right is entitled under the United States constitution. Id., 234 n.16.

[2] The court is quite aware of the threshold problem of state action or state involvement. This issue was not present in *Clark* v. *Bridgeport,* 645 F. Sup. 890 (D. Conn. 1986), because the defendant was a political subdivision and the state actor was the assistant city attorney. If any case, however, would cry out for giving full meaning to *Shelley* v. *Kraemer,* 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 2d 1161 (1948), and burying the outrageous decision of *Lockwood* v. *Killian,* 172 Conn. 496, 375 A.2d 996 (1977), it would be a

Before evaluating the constitutional claims the court deems it advisable to put this case in its proper perspective. The plaintiff does not claim and the court does not find that the jury in this trial was biased. Clearly, the issue of liability was a close call and could reasonably have gone either way under the rules of comparative negligence. But that, of course, is not the issue that is before the court. The sole issue is whether the defendant violated the constitutional rights of the plaintiff in the manner in which he exercised his peremptory challenges.

On May 29, 1986, the case was first tried to a jury[3] presided over by a state trial referee, *Hon. Henry J. DeVita*. The jury, in the first trial, was composed of six women, three of whom were black. On June 5, 1986, the state trial referee declared a mistrial because the jurors were hopelessly deadlocked, four in favor of finding liability for the plaintiff and two for the defendant.[4] As stated in his brief, counsel for the defendant believed that "[a]ll three (3) black jurors voted in favor of awarding damages to the plaintiff."

Since the defendant came from New Zealand, where he was then employed, to try this case, he was accommodated with a prompt retrial. For the retrial a panel of venirepersons was selected by lot[5] on June 12, 1986, and the court, *Berdon, J.*, indoctrinated them at the start of the voir dire. The remarks included the following: "[O]ur state constitution and our state statutes

---

case that raises these issues. State action requirement is satisfied when the court implicitly puts its stamp of approval on a practice by allowing it to occur in the courtroom.

[3] The first trial, pursuant to an agreement of the parties, was bifurcated with only the issue of liability submitted to the jury.

[4] The jury sent the state trial referee the following note: "4 members are for the plaintiff 50-50[;] 2 members are 65 for plaintiff 35 for defendant." Presumably the jury was referring to the percentage of negligence attributable to each party.

[5] General Statutes § 51-239.

. . . [provide that] each side may excuse up to a certain number of prospective jurors without citing any reason at all to the court. They are called peremptory challenges. So if you are not accepted for this jury do not feel bad. It's probably one of the attorneys on behalf of his or her client exercising that constitutional and statutory right to excuse you without citing any reason to the court." Each party was granted four peremptory challenges because two alternates, in addition to the jury of six, were to be selected. General Statutes §§ 51-241, 51-243.

The first panel of venirepersons consisted of fifteen, four black and eleven white persons. At the outset of the voir dire, the court excused on its motion for cause one of the black venirepersons (together with several others for varying reasons) because he had associated with the plaintiff's husband. The second black juror, upon motion by the plaintiff and with the agreement of the defendant, was excused for cause because he was not fully able to comprehend the proceedings. The third and fourth black persons were peremptorily excused by the defendant. By the time the first panel was exhausted, the plaintiff had exercised three peremptory challenges, the defendant had exercised two peremptory challenges by excusing the two black venirepersons, and four white jurors had been accepted.

A second panel of eleven venirepersons, consisting of one black person and ten white persons, was selected by lot. The first person of the second panel called for voir dire, a white person, was accepted as the fifth juror. The second person, a black woman, was examined by the plaintiff's counsel. Her responses to the questions indicated that she worked at a local factory, that she had once been involved in an automobile accident but had not been injured, that she would not have difficulty with the issue of damages if the jury found the defendant liable, that she believed that a person

did not necessarily have to have a broken bone to experience pain and that she would not give more credibility to a police officer merely because he was a police officer. At the conclusion of the plaintiff's voir dire examination, counsel for the defendant said "I've no questions." Out of venireperson's presence, the plaintiff accepted her and the defendant struck her by using his third peremptory challenge.

The plaintiff then moved to strike all the jurors chosen and commence the selection of another jury with a new panel, arguing that her federal and state constitutional rights to trial by jury and equal protection of the law were violated because the defendant had used his three peremptory challenges to remove every black venireperson from the two panels. A hearing was held on the plaintiff's motion. Counsel for the defendant conceded that race was a *factor,* but not the only one, in making his decision to challenge peremptorily the three black venirepersons. Although he claimed there were other reasons, he did not articulate them. Counsel made it quite clear that he was of the opinion that he was not required to give reasons and that if the court did strike the jurors selected and begin another voir dire, he would exercise his client's challenges in any way he saw fit without justifying his decision.

The court reserved decision on the plaintiff's motion. The remaining juror and alternates were selected from the balance of the second panel, which resulted in impaneling an all white jury and alternates. After hearing the evidence, the summation of the attorneys and the court's instructions, the jury on June 24, 1986, retired at 2 p.m. to consider its verdict. At 3:35 p.m. it returned a verdict in favor of the defendant. The jurors, in answering interrogatories that had been submitted to them, found that the plaintiff had proven the defendant to be negligent, but that his negligence was not a proximate cause of the accident.

## I

### STATE CONSTITUTIONAL RIGHT TO TRIAL BY IMPARTIAL JURY

The right to trial by jury in a civil case is firmly enshrined in the state constitution. Section 19 of article first of the Connecticut constitution, as amended by article fourth, provides in part that the "right to trial by jury shall remain inviolate." "Litigants have a constitutional right to have questions of fact decided by a jury." *Seals* v. *Hickey,* 186 Conn. 337, 350, 441 A.2d 604 (1982). The right "is fundamental to the American scheme of justice . . . ." *Duncan* v. *Louisiana,* 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491, reh. denied, 392 U.S. 947, 88 S. Ct. 2270, 20 L. Ed. 2d 1412 (1968). It is secured "wherever that right existed when our constitution was adopted in 1818." *Robertson* v. *Apuzzo,* 170 Conn. 367, 381, 365 A.2d 824, cert. denied, 429 U.S. 852, 97 S. Ct. 142, 50 L. Ed. 2d 126 (1976); *Gentile* v. *Altermatt,* 169 Conn. 267, 298, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). The right to trial by jury in a negligence case, such as the present one, existed at common law and therefore is protected by the constitutional right to trial by jury.

Although § 19 does not explicitly guarantee a civil trial by an "impartial" jury as do § 10 of article first of the state constitution and the sixth amendment of the federal constitution for criminal trials, it is clearly implicit. See *State* v. *Castonguay,* 194 Conn. 416, 420, 481 A.2d 56 (1984). "[A]nything less than an impartial jury is the functional equivalent of no jury at all." *Miami* v. *Cornett,* 463 So. 2d 399, 402 (Fla. App. 1985); *People* v. *Wheeler,* 22 Cal. 3d 258, 266, 583 P.2d 748, 148 Cal. Rptr. 890 (1978).

An essential element of this right to trial by an impartial jury is that the venire be composed of a representative cross section of the community. *State* v. *Nims,* 180 Conn. 589, 594–95, 450 A.2d 1306 (1980). In *Smith* v. *Texas,* 311 U.S. 128, 130, 615 S. Ct. 164, 85 L. Ed. 84 (1940), Justice Black, writing for a unanimous court, stated the following: "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." It is also absolutely clear that the requirement that the pool of jurors for the venire be composed of a cross section of the community applies to both civil and criminal trials alike. "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946) (Frankfurter, J., dissenting).

One important reason that the petit jury must be drawn from a venire composed of a representative cross section of the community is to assure "diffused impartiality." Id., 227; *Commonwealth* v. *Soares,* 377 Mass. 461, 480, 387 N.E.2d 449 (1979). "The rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and

hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." *People* v. *Wheeler,* supra, 266–67. It is clear, however, that the "jury array need not mirror the sociological composition of the community . . . or be mathematically proportionate to the percentage of the group in the community. . . . Substantial underrepresentation is required to make out a prima facie case. . . ." (Citations omitted.) *State* v. *Haskins,* 188 Conn. 432, 440, 450 A.2d 828 (1982).

Although this representative cross section of the community standard was not articulated in the early common law, fairness and integrity in the selection process were always the touchstone. "It being indispensable to the pure administration of justice, in trials by jury, that the jurors should be selected with the utmost fairness and integrity, courts have always deemed it a good cause of challenge to them, that the officer returning them was interested, or guilty of any partiality or misconduct, in their selection; and so careful and jealous are they on this subject, that the objection on this ground goes, not only to the particular jurors returned under the influence of such improper motives or conduct, but extends to the whole panel and is a cause of challenge to the array." *Quinebaug Bank* v. *Tarbox,* 20 Conn. 510, 516–17 (1850).

Notwithstanding the representative cross section of the community standard, there is no constitutional right that the petit jury will result in any particular composition. "The random drawing of petit jurors from the venire is by its very nature inconsistent with any guarantee of a particular resulting composition." *McCray* v. *Abrams,* 750 F.2d 1113, 1128 (2d Cir. 1984), reh. denied, 756 F.2d 277 (2d Cir. 1985) (en banc). Not

"every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community." *Thiel* v. *Southern Pacific Co.*, supra, 220. Indeed the impracticability of attempting to achieve a petit jury composed of a cross section is obvious. *McCray* v. *New York*, 461 U.S. 961, 969, 103 S. Ct. 2438, 77 L. Ed. 2d 1322 (1982) (Marshall, J., dissenting).

This, however, does not mean that the constitutional right to an impartial jury ceases to be operative during the selection of the petit jury. If this were so there would be no purpose for mandating that the venire be composed of a cross section of the population. "No defendant has ever been tried before a venire; the venire is not the body that deliberates in the jury room; no defendant has ever been found guilty by a venire. If there is a . . . [constitutional] requirement that the venire represent a fair cross section of the community, it must logically be because it is important that the defendant have the chance that the petit jury will be similarly constituted." *McCray* v. *Abrams*, supra. It follows, then, that the state constitutional right to trial by an impartial jury guarantees a party not the right to a jury composed of a cross section of the population, but a fair chance of obtaining such a jury. Id., 1129. In other words, a petit jury is "inevitably . . . affected by the vicissitudes of the draw . . . ." *Commonwealth* v. *Soars*, supra, 483. Accordingly, those procedures used to select the petit jury during the voir dire that may interfere with the chance that the petit jury will represent a fair cross section of the community are subject to constitutional scrutiny of the right to trial by jury under both §§ 8 (criminal ) and 19 (civil) of article first.[6]

---

[6] Because of the nature of the right—i.e., right to trial by an impartial jury, state action is not necessary. See *Miami* v. *Cornett*, 463 So. 2d 399 (Fla. App. 1985); *Holley* v. *J & S Sweeping Co.*, 143 Cal. App. 3d 588, 192 Cal. Rptr. 74 (1983); see footnote 2, supra.

Nevertheless, the constitution is not offended when a venireperson, even if a member of a cognizable group, is excused for cause when he or she has an interest, bias or prejudice related to the unique situation presented by the case or has expressed or formed an opinion regarding the case. This would also be the situation when the prospective juror is so closely connected to a party or witness that it can be presumed that he or she has such an interest, bias or prejudice. "Removal in such cases is clearly appropriate in the interest that persons actually prejudiced not be seated on the jury even if it tends to skew an otherwise balanced panel." Id., 482. So, in the present case, the plaintiff did not complain about the court's excusing the black venireperson because he knew and was associated with the plaintiff's husband.

## II

### THE PEREMPTORY CHALLENGE

The next question before the court is whether the use of the peremptory challenge is subject to this constitutional right of the possibility of obtaining a jury composed of a cross section of the community.

The peremptory challenge predates the common law and is said to have been derived from Roman law. " '[T]he *Lex Servilia* (B.C. 104) enacted that the accuser and the accused should severally propose one hundred *judices,* and that each might reject fifty from the list of the other, so that one hundred would remain to try the alleged crime.' " W. Forsyth, History of Trial by Jury 175 (1852), quoted in *Batson* v. *Kentucky,* 476 U.S. 79, 119, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (Burger, C.J., dissenting). It certainly has its roots firmly entrenched in the early common law. *Swain* v. *Alabama,* 380 U.S. 202, 212–13, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1964). In England today, however, the peremptory challenge together with the challenge for cause

has fallen into disuse. Nevertheless, "peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society." Id., 218.

In Connecticut, the right to challenge peremptorily a venireperson was preserved for all times in the state constitution. Article fourth of the amendments applicable to § 19 of article first, adopted December 22, 1972, provides in part as follows: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate." Nevertheless, it is obvious that the framers of this amendment did not intend to expand the common law peremptory challenge but did seek to guarantee the right to question each juror individually. See 14 H.R. Proc., Pt. 5, 1971 Sess., p. 2366; 14 S. Proc., Pt. 5, 1971 Sess., p. 1984.

The purposes of the peremptory challenge are to "eliminate those jurors perceived as harboring subtle biases with regard to the case which were not elicited on voir dire or which do not establish legal cause for challenge . . . ." *Commonwealth* v. *Soares,* supra, 483–84. "Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Swain* v. *Alabama,* supra, 219–20. Although the peremptory challenge has been described as one to be "exercised without a reason stated, without inquiry and without being subject to the court's control"; id., 220; even *Swain* recognized that the "purposeful or deliberate denial to Negroes on account of race of participation as jurors in the

administration of justice violates the Equal Protection Clause." Id., 203–204. And *Batson* v. *Kentucky,* supra, put the flesh on *Swain's* bones by redefining the evidentiary burden of proof required in a given case. *Batson* v. *Kentucky,* supra, 93–98.

If a party were to have the unfettered right to exercise peremptory challenges for any reason, the right to trial by an impartial jury would lose its meaning. So, if blacks could be struck from the jury merely because they were black, there would be no purpose in taking elaborate steps to guarantee their inclusion in the venire. This is especially true when the minority group is composed of few individuals and their complete exclusion from the jury could be effectively accomplished by the exercise of peremptory challenges. For example, in the present case, from the two panels of prospective jurors consisting of twenty-six selected by lot from the venire, only five were black. Since each party had four peremptory challenges, the basic concept of trial by a jury composed of a possibility of a cross section of the community could be frustrated by exercising them against the minority group. "[W]hen a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds—we may call this 'group bias'—and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority. Seen in this light, the pre-

sumed group bias that triggered the peremptory challenges against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule." *People* v. *Wheeler,* supra, 276.

There are those who predict that any limitation on the peremptory challenge signals the end of its use as "an effective jury selection tool." *McCray* v. *Abrams,* supra, 1139. Tools that deprive a party of a trial by an impartial jury or even the perception of such a trial have no place in a constitutional democracy. Nevertheless, this constitutional tuning of the peremptory challenge does not deprive the litigant of any legitimate trial tactic. "In fashioning a balance between the goal of diffused impartiality in the petit jury and the limitations inherent in a feasible and fair process of jury selection, we preserve a legitimate and significant role for the peremptory challenge. Toward the end of 'eliminat[ing] extremes of partiality on both sides,' and of assuring the parties 'that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise,' [*Swain* v. *Alabama,* supra, 219], peremptory challenges may be used to eliminate prospective jurors whose unique relationship to the particular case raises the spectre of individual bias. Both parties retain wide discretion to exercise peremptory challenges in this manner." *Commonwealth* v. *Soares,* supra, 485.

Therefore, the court concludes that the use of peremptory challenges to exclude prospective jurors solely on the basis of membership in a cognizable group, within the meaning of the representative cross section rule, violates a party's state constitutional right to trial by jury in both civil and criminal cases. Other state courts, with similar state constitutional provisions which protect the right to trial by jury, have come to the same conclusion. E.g., *Malvo* v. *J. C. Penney Co.,* 512 P.2d 575 (Alaska 1973) (civil action); *Holley* v.

*J & S Sweeping Co.,* 143 Cal. App. 3d 588, 192 Cal. Rptr. 74 (1983) (civil action); *People* v. *Wheeler,* supra (criminal action); *Miami* v. *Cornett,* supra (civil action); *State* v. *Neil,* 457 So. 2d 481 (Fla. 1984); *Commonwealth* v. *Soares,* supra (criminal action); *State* v. *Gilmore,* 103 N.J. 508, 511 A.2d 1150 (1986) (criminal action).

### III

### BURDEN OF PROOF AND PROCEDURE FOR DETERMINING WHETHER RIGHT TO TRIAL BY JURY HAS BEEN VIOLATED

Although recognizing that it is unconstitutional purposefully and deliberately to deny a black person participation in a jury because of race, *Swain* placed on a party "a crippling burden of proof" by requiring proof of the repeated striking of blacks over a number of cases. *Batson* v. *Kentucky,* supra, 93; *McCray* v. *Abrams,* supra, 1120. Such a burden deprives a person of a remedy and merely gives lip service to the constitutional right. Just as the *Swain* burden of proof is now unacceptable for equal protection analysis; *Batson* v. *Kentucky,* supra; so is it clear that it should not be used to determine whether a person has been deprived of his or her constitutional right to a trial by an impartial jury. *McCray* v. *Abrams,* supra, 1131.

In formulating an appropriate procedure, however, the court must be careful not to discourage a party "from using peremptory challenges in all proper instances to further, though not undermine, the right to trial by an impartial jury." *State* v. *Gilmore,* supra, 533. Accordingly, the court patterns the required procedure and burden of proof on the seminal case of *People* v. *Wheeler,* supra.

As a threshold matter, the party who believes his opponent is using his or her peremptory challenges in

an unconstitutional manner must make a timely objection and a complete record of the abuse. *People* v. *Wheeler,* supra, 280. In the present case, this was done by the plaintiff. After the last black juror was excused, the plaintiff sought to strike the chosen jurors and to proceed with a new panel. A record was made of the number of black jurors excused and the party who excused them.

Next, the party "must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule." Id.[7] Clearly, in the present case, the blacks challenged were members of a cognizable group. *State* v. *Haskins,* 188 Conn. 432, 437, 450 A.2d 828 (1982). One court suggested that it should look to its equal rights amendment "as definitive, in delineating those generic group affiliations which may not permissibly form the basis for juror exclusion . . . ." *Commonwealth* v. *Soares,* supra, 488–89. Another court held that such a cognizable group were Jews and when the defendant was Jewish the prosecutor was forbidden peremptorily to challenge Jews simply because they were Jews. *People* v. *Kagan,* 101 Misc. 2d 274, 420 N.Y.S.2d 987 (1979).[8] This court, however, need go no further than the issue at hand. It is for another court at another time to determine whether the cognizable group should be extended beyond race to include religious, ethnic, sexual or other groups suggested in *Soares* and *Wheeler.*

[7] The party questioning the other's use of the peremptory challenge need not be a member of the excluded group. *People* v. *Wheeler,* 22 Cal. 3d 258, 280, 583 P.2d 748, 148 Cal. Rptr. 890 (1978). Challenging parties, however, "may well be more likely to carry the ultimate burden of persuasion if they are members of the excluded group, especially when the" other is not. *State* v. *Gilmore,* 103 N.J. 508, 536 n.9, 511 A.2d 1150 (1986).

[8] But see *People* v. *McCray,* 57 N.Y.2d 542, 549, 443 N.E.2d 915, 457 N.Y.S.2d 441 (1982), cert. denied, 461 U.S. 961, 103 S. Ct. 2438, 77 L. Ed. 2d 1322 (1983) (holding that the "benefits of requiring the prosecutor to justify the exercise of certain peremptory challenges are simply outweighed by the damage to a system of jury selection which best serves to guarantee a fair and impartial jury").

The challenging party must rebut the presumption that the other party is exercising his or her peremptory challenges in a constitutional manner. This presumption is not only mandated by the constitutional cloak placed on the peremptory challenge, but also out of homage to its very old credentials; *State* v. *Gilmore,* supra, 535; and "out of respect for counsel as officers of the court." *People* v. *Wheeler,* supra, 278.

In order for the moving party to rebut this presumption, he or she must establish a prima facie case by showing, on the basis of all the circumstances of the case, "a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias. We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." *People* v. *Wheeler,* supra, 280–81.

In the present case, given the totality of the circumstances, the court finds that there was a strong likelihood that the defendant used his peremptory challenges on those excused by him because they were black, rather than because of any specific bias.[9] "Whether

---

[9] The court is aware of *State* v. *Upshaw,* 7 Conn. App. 257, 264, 508 A.2d 791 (1986), in which it was found, on the facts of that case, that "the defend-

race was, in fact, the exclusive basis need not be proved; *the objecting party need only make a prima facie showing,* as here, that the peremptory challenges against black jurors were most likely motivated by group bias alone." *Holley* v. *J & S Sweeping Co.,* supra, 593–94. The defendant used three of his four peremptory challenges to eliminate from both panels every black person who was not excused for cause by the court. He never exercised his fourth challenge. Surely that alone establishes a prima facie case here. See *Batson* v. *Kentucky,* supra, 97; *Clark* v. *Bridgeport,* supra, 891. Furthermore, after an uneventful voir dire of the last black person by the plaintiff, the defendant merely excused her without asking any questions. Finally, in this case, the proof of such a likelihood is further enhanced when the above facts are placed in the context that the plaintiff is black and the defendant is white, and counsel for the defendant believed the jury in the first trial split along racial lines.

Clearly, the plaintiff established a prima facie case.[10] Under these circumstances, the burden shifts to the other party to show that his or her challenges were not predicated on group bias. "The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party

---

ant failed to show a substantial likelihood that the state's peremptory challenge of the black venirepersons was made on the basis of the prospective juror's affiliation with that group." The opinion seems to place a greater burden on the objecting party then merely establishing a prima facie case in order to shift the burden to the other party to show that his or her challenges were not predicated on group bias. One reason for this may be that the opinion in *Upshaw* was announced on May 6, 1986, and the court may not have had an opportunity to consider the less stringent burden established in *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), albeit on equal protection grounds, which was decided just six days before.

[10] *"If the court finds no such likelihood, no inquiry may be made of the person exercising the questioned peremptories."* (Emphasis added.) *State* v. *Neil,* 457 So. 2d 481, 486 (Fla. 1984).

must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses— i.e., for reasons of specific bias . . . . He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds." *People* v. *Wheeler,* supra, 281–82.

At the hearing on the plaintiff's motion to strike the jurors chosen and start again with a new panel, the defendant conceded that race was *a* factor. He, however, also claimed other vague reasons but never specifically related them to justify the excusing of even one of the black venirepersons. His general position was expressed as follows: "I'm entitled in a civil case to exercise my [client's] peremptory challenge the way I see fit. That's clear. There's no case in this or any other jurisdiction that asserts otherwise." The general assertions of the defendant's counsel are insufficient. The defendant "must articulate a neutral explanation related to the particular case to be tried." *Batson* v. *Kentucky,* supra, 98. "While he need not approximate the grounds required by a challenge for cause, his reasons must pertain to the individual qualities of the prospective juror and not to that juror's group association." *Commonwealth* v. *Soares,* supra, 491. The defendant failed to carry his burden.

The court feels compelled to comment on one other matter. In addition to the violation of the plaintiff's constitutional right to a trial by an impartial jury, there is another substantial concern. The use of peremptory challenges to remove all the possible jurors of one of the party's race seriously impairs the perception of justice. Members of a minority, under those circumstances, could never feel that they received a fair trial. "Selec-

tion procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson* v. *Kentucky*, supra, 87. " '[J]ustice must satisfy the appearance of justice.' *Offutt* v. *United States*, 348 U.S. 11, 14 [75 S. Ct. 11, 99 L. Ed. 11]." (Emphasis added.) *In re Murchison*, 349 U.S. 133, 136, [75 S. Ct. 623, 99 L. Ed. 942] (1955). And for the black person, "[d]iscrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.' " *Batson* v. *Kentucky*, supra, 87–88, quoting *Strauder* v. *West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1880).

This court is unable to allow to stand this verdict, which was rendered by a jury chosen in violation of the plaintiff's state constitutional right to a trial by an impartial jury under § 19 of article first, as amended, of the constitution of the state of Connecticut. Accordingly, the motion to set aside the verdict is granted and a new trial is ordered.