## WESLEY BRADFORD ET AL. *v.* FRANCIS R. BRENNAN ET AL.

| SUPERIOR COURT | JUDICIAL DISTRICT OF WATERBURY | FILE NO. 79581 |
|---|---|---|

Memorandum filed October 23, 1992

*Drubner, Hartley & O'Connor,* for the named plaintiff et al.

*Corporation counsel of the city of Waterbury,* for the named defendant et al.

*Cotter, Cotter & Sohon,* for the defendant Robert Andrew Batters.

BLUE, J. In 1863, the Connecticut Supreme Court stated that when a town is sued for damages, a resident and taxpayer of that town is disqualified from being a juror in the case. *Bailey* v. *Trumbull,* 31 Conn. 581, 582 (1863). Although *Bailey* did not cite authority for this rule, it was consistent with the common law of the time. See S. Thompson & E. Merriam, A Treatise on the Organization, Custody and Conduct of Juries (1882), p. 185. In modern times, *Bailey* has been largely forgotten. Although its rule is occasionally followed, it is, in practice, rather common for jurors to sit, without objection, on cases involving the towns in which they reside. *Bailey,* however, has never been overruled. Now, two different parties in this personal injury case have dramatically called the spirit of *Bailey* from the ancient mists. They seek to have all residents and taxpayers of the city of Waterbury categorically disqualified from jury service in the present case. The question before the court is whether this venerable authority, duly summoned, must be obeyed.

This is a case involving a serious personal injury in which the city of Waterbury and one of its employees are named as codefendants. The named plaintiff, Wesley Bradford, alleges that in 1985 he was a student at Kennedy High School, a public high school in Waterbury. While he was in a school lavatory, a fellow student, Andrew Batters, threw a firecracker in his direction. The firecracker exploded near Bradford's ear, causing him to lose permanently a good part of his hearing. He has sued Batters, the city of Waterbury, and the assistant principal of the school, Francis R. Brennan. Brennan is alleged to have been negligent

in his supervision of the lavatory, and the city of Waterbury is being sued under the theory of respondeat superior.

At the commencement of jury selection, Bradford moved to have all Waterbury residents and taxpayers disqualified from jury service in his case, citing what he considers to be their direct or indirect pecuniary interest in its outcome. The interest asserted is twofold. First, Bradford claims that a substantial judgment against the city will result in an increase in municipal taxes and a decline in municipal services affecting all residents, taxpayers and nontaxpayers alike. Second, Bradford cites the ancient Connecticut doctrine that "execution upon a judgment against a town may be levied on the property of any one of its inhabitants. *Beardsley* v. *Smith,* 16 Conn. 368, 376 [1894]." *Nichols* v. *Ansonia,* 81 Conn. 229, 235–36, 70 A. 636 (1908). Batters has joined in this motion, claiming that jurors with this pecuniary interest will be more likely to shift the blame from the city and its employee to him. Brennan and the city oppose the motion.

"In Connecticut, the disqualification of a juror may be based upon the General Statutes or upon the rules of the common law." *Johnson* v. *New Britain General Hospital,* 203 Conn. 570, 580, 525 A.2d 1319 (1987). The principal statute to address the disqualification of jurors is General Statutes § 51-217 (c) (1). Under § 51-217 (c) (1), a person is disqualified to serve as a juror if he or she exhibits some "quality" that will impair the capacity to serve as a juror, has a felony conviction, is unable to speak English, holds a high ranking governmental position, or has a physical or mental disability. The statute does not address the particular disqualification asserted here, but little can be drawn from this omission because the statute only describes conditions that preclude jury service in *all* cases, rather

than conditions (such as kinship to a party) that preclude jury service in a particular case.

The present case is, therefore, controlled by the common law. Ascertaining the common law on this subject, however, is not an easy or mechanical matter. *Bailey,* no doubt, provides a hint, but it is not a secure foundation for the sweeping motion now before the court. Even more importantly, neither the law nor society have stood still since *Bailey* was decided. Significant legal and demographic developments in the last century strongly militate against the proposal advanced here. If the motion now before the court is to be correctly decided, a number of factors must be taken into account: (1) the common law background to *Bailey;* (2) *Bailey* and its progeny in Connecticut; (3) the development of the law in other states; (4) constitutional considerations concerning jury selection; (5) the execution of a potential judgment; (6) demographic changes; and (7) given these other considerations, the degree to which *Bailey* is controlling. These factors will be reviewed in order.

I

THE COMMON LAW BACKGROUND

Writing in the early seventeenth century, Sir Edward Coke listed certain relationships that would support a principal challenge to a juror. One of these involved residents of municipalities. "If a body politick . . . bring any action that concernes their body politick . . . if the juror be of kindred to any that is of that body (although the body politick . . . can have no kindred) yet for that those bodies consist of naturall persons, it is a principall challenge." E. Coke, The First Part of the Institutes of the Lawes of England (1628), p. 157.

No serious judicial consideration was given to this statement for over a century. In 1766, however, Lord

Mansfield decided the celebrated case of *Hesketh* v. *Braddock*, 97 Eng. Rep. 1130 (1766). The plaintiffs in *Hesketh* were treasurers of the city of Chester who alleged that the defendant, a grocer, had breached a municipal law prohibiting nonresidents from selling goods at retail within the city. The defendant objected that the sheriff and the jury were freemen in the city. Mansfield opined that "any degree, even the smallest degree of interest in the question depending, is a decisive objection . . . ." Id., 1135. The objection to the jury, however, was sustained on a relatively narrow ground. "The exclusion of foreigners is a monopoly to the freemen themselves. . . . And in this action, the very freemen who were to gain by securing this monopoly, were the jury to determine it. Therefore, every freeman had an interest and bias in the matter of the issue to be tried in this cause." Id., 1135–36.

These early authorities were concerned with cases in which a municipality was a *plaintiff*. Their concern was not that the residents of the municipality have a financial interest in the outcome of the case, but rather that, when the very object of the suit is to assert the rights of residents, the residents by definition have an interest in the outcome of the case. When, a century after *Hesketh*, an attempt was made in the British courts to preclude from jury service municipal residents with a supposed *financial* interest in the outcome of the case, the argument was decisively rejected.

In 1848, John Martin, a resident of Ireland, (then under English rule) was convicted by a Dublin court of treason for writing certain unwelcome articles in a publication called the Irish Felon. He brought a writ of error to the Court of Queen's Bench complaining that a juror had been interested in his conviction by reason of a charter of Henry V granting to the city of Dublin the goods of felons convicted within the city. His argument, essentially, was that as a result of the city's finan-

cial gain, the juror's taxes would diminish, and the juror consequently had an interest in the case prohibited by *Hesketh*. This argument was rejected. The court noted that "it is possible that the juror may die, or cease to be a proprietor of rateable property, before a rate is imposed. . . . [I]t is utterly impossible to discover, describe, or define any actual interest in the result of a suit which is to depend and arise on such a series of contingencies as this. . . . [T]here is not any resemblance between this and any decided case where an objection to a juror . . . was allowed on the ground of interest . . . . Authority establishes the distinction between present and actual interest, and that which is future and contingent." *Queen* v. *Martin*, 6 John Wallis, State Trials N.S., 925, 1097–98 (1848).

No English court since *Martin* has considered a challenge to residents of municipalities. In the early nineteenth century in this country, however, a number of state courts categorically disqualified residents of municipalities from sitting in cases where their municipalities were parties on the ground that jurors "must be omni exceptione majores; free from every objection, and wholly disinterested." *Wood* v. *Stoddard*, 2 Johns. 194, 195 (N.Y. 1807). The homage to impartiality in *Hesketh* was frequently cited, but its actual holding was not. A list of citations may be found in annot., 81 A.L.R.2d 708, 711–12 (1962).

## II

### *Bailey* AND ITS PROGENY

*Bailey* v. *Trumbull*, supra, was a highway defect case against the town of Trumbull. The verdict was for the plaintiff. After the verdict, the town moved to arrest the judgment "on the ground that one of the jurors who tried it, and joined in the verdict, was the owner of real estate in the defendant town, and a taxpayer therein." Id., 582. The court noted that "the amount of his prop-

erty there, some $3,000, probably made him a larger landowner than a majority of the inhabitants of the town . . . ." Id., 583. The court stated that "no doubt this was such a disqualification of the juror, that, had the fact come to the knowledge of the court before the trial commenced, he would have been set aside and his place supplied by another." Id., 582. Because, however, the town did not object in a timely manner to his sitting, the objection was held to have been waived. Id., 583.

The Connecticut Supreme Court has not revisited this subject since *Bailey* was decided and has never cited *Bailey,* favorably or unfavorably, on this ground. In this century, however, it has responded to analogous arguments with disfavor. In *McCarten* v. *Connecticut Co.,* 103 Conn. 537, 131 A. 505 (1925), it held that a pensioner and former baggage master of the defendant railroad company could sit as a juror on the case. It stated that "a possible pecuniary interest on the part of the juror, in the result of the trial, is too remote to merit serious consideration. . . . The ground of disqualification, if any, was one of possible bias, and if it had a technical existence, was a harmless one unless it created an actual prejudice or bias in the mind of the juror." (Citation omitted.) Id., 545.

In *Morgan* v. *St. Francis Hospital & Medical Center,* 216 Conn. 621, 583 A.2d 630 (1990), the Supreme Court held that the trial court had properly refused to disqualify for cause jurors who were employed by the defendants' insurance company. The court reasoned that since evidence of insurance coverage is generally inadmissible the veniremen were unlikely to become aware of their employer's involvement. It stated that, "to succeed on a claim of bias the [plaintiff] must raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) Id., 626.

## III

### Developments in Other States

The majority of American cases on the subject decided in the nineteenth century held residents of municipalities to be disqualified from sitting as jurors in actions involving those municipalities. In the twentieth century, however, the trend has been sharply reversed. No state has adopted the per se disqualification rule in many decades. The only state to have affirmatively chosen to retain it in modern times is Iowa. See *Lang* v. *Des Moines,* 294 N.W.2d 557, 563–64 (Iowa 1980). A number of states have abolished it by statute. See, e.g., *Commonwealth* v. *Reed,* 67 Mass. (1 Gray) 472, 473 (1854); *In re Presentation of Passaic County Grand Jury,* 220 N.J. Super. 470, 477–78, 532 A.2d 757 (1986); *Hildreth* v. *Troy,* 101 N.Y. 234, 236, 4 N.E. 559 (1886). Without exception, twentieth century courts considering the matter for the first time have concluded that the per se disqualification rule should be rejected. *Prescott* v. *Sumid,* 30 Ariz. 347, 350–51, 247 P. 122 (1926); *C.A. Rees & Co.* v. *Road Improvement District No. 1,* 167 Ark. 383, 387, 267 S.W. 770 (1925); *Detroit* v. *Detroit Ry.,* 134 Mich. 11, 14, 95 N.W. 992 (1903); *Bell* v. *Bay St. Louis,* 467 So. 2d 657, 662–63 (Miss. 1985); *School District No. 1* v. *Globe & Republic Ins. Co.,* 142 Mont. 220, 224–25, 383 P.2d 482 (1963); *Maddex* v. *Columber,* 114 Ohio St. 178, 185, 151 N.E. 56 (1926). And, most importantly, two state courts in recent decades have overruled earlier precedent adopting the per se disqualification rule. *Ridglea, Inc.* v. *Unified School District,* 206 Kan. 111, 476 P.2d 601 (1970); *State ex rel. Douglas County* v. *Sanders,* 294 Or. 195, 655 P.2d 175 (1982). These courts have generally followed the reasoning of the Supreme Judicial Court of Massachusetts one century ago: "The general rule, that judges and jurors should not be interested in a contro-

versy which they are called to settle, is founded upon familiar principles of justice. But there are some kinds of interest which are too minute and too remote to be regarded. Every citizen of the Commonwealth is interested in the enforcement of the laws. But if that interest disqualified him from sitting as a juror, or otherwise participating in a trial, no criminal could be punished. From the necessity of the case, we trust the integrity and sense of justice which most men possess so far as to believe they will not be improperly influenced by an interest of this kind, which they have in common with the whole community." *Commonwealth* v. *Brown,* 147 Mass. 585, 589–90, 18 N.E. 587 (1888), writ of error dismissed, 144 U.S. 573, 12 S. Ct. 757, 36 L. Ed. 546 (1892).

## IV

### CONSTITUTIONAL CONSIDERATIONS CONCERNING JURY SELECTION

In 1936, the United States Supreme Court noted the modern trend to eliminate per se disqualification rules and held that governmental employees are not absolutely disqualified to serve as jurors in criminal cases. *United States* v. *Wood,* 299 U.S. 123, 146–47, 57 S. Ct. 177, 81 L. Ed. 78 (1936).

In more recent years, the Supreme Court has held that in criminal cases, "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor* v. *Louisiana,* 419 U.S. 522, 528, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). It explained that "[t]he purpose of a jury is to guard against the exercise of arbitrary power—to make available the common-sense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge. . . . This prophylactic vehi-

cle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. . . . Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." (Citation omitted.) Id., 530.

The Supreme Court has since made it clear that the constitutional prohibition against racial discrimination in jury selection goes beyond the absolute exclusion of identifiable groups. Selection procedures that result in substantial underrepresentation of racial or other identifiable groups establish a prima facie case of discriminatory purpose. *Castaneda* v. *Partida,* 430 U.S. 482, 494–95, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977).

The constitutional requirement of an impartial jury drawn from a cross-section of the community applies to civil procedures as well as to criminal ones. *Edmonson* v. *Leesville Concrete Co.,* 500 U.S. 614, 618–19, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991); *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946). This right is protected by article first, § 19, of the Connecticut constitution, as well as by the federal constitution. *Williams* v. *Coppola,* 41 Conn. Sup. 48, 53–55, 549 A.2d 1092 (1986). It is now clear in both civil and criminal cases that "if a court allows jurors to be excluded because of group bias, [it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice —our citizens' confidence in it." (Internal quotation marks omitted.) *Georgia* v. *McCollum,* 505 U.S. 42, 49–50, 112 S. Ct. 2348, 120 L. Ed. 2d 225 (1992).

## V

### THE EXECUTION OF A POTENTIAL JUDGMENT

"In Connecticut, as in Massachusetts and Maine, by common law or immemorial usage, the property of any

inhabitant may be taken on execution upon a judgment against the town." *Bloomfield* v. *Charter Oak Bank,* 121 U.S. 121, 129, 7 S. Ct. 865, 30 L. Ed. 923 (1887). This doctrine "has not been generally accepted." *Meriwether* v. *Garrett,* 102 U.S. 472, 501, 26 L. Ed. 197 (1880).

In *Rees* v. *Watertown,* 86 U.S. (19 Wall.) 107, 22 L. Ed. 72 (1874), the Supreme Court held that the federal courts sitting in equity do not possess the power to subject the property of municipal residents to an execution to satisfy a judgment against the municipality. It reasoned that "this summary proceeding would involve a violation of the rights of the [citizen]. He has never been heard in court. He has had no opportunity to establish a defence to the debt itself, or if the judgment is valid, to show that his property is not liable to its payment. . . . The proceeding supposed would violate that fundamental principal contained in chapter twenty-ninth of Magna Charta, and embodied in the Constitution of the United States, that no man shall be deprived of his property without due process of law—that is, he must be served with notice of the proceeding, and have a day in court to make his defence." Id., 122.

*Rees* involved a municipality in Wisconsin. The ancient common law of the New England states was not before the court. The court distinguished the peculiar New England tradition by stating that "the suit in those States is brought in form against the inhabitants of the town, naming it. The individual inhabitants, it is said, may and do appear and defend the suit, and hence it is held that the individual inhabitants have their day in court, are each bound by the judgment, and that it may be collected from the property of any one of them." Id., 122–23. This was essentially the reasoning of the Connecticut Supreme Court in *Beardsley* v. *Smith,* supra, 377–79, as well.

Even as a technical matter, the distinction seized upon in *Rees* and *Beardsley* is clearly outmoded in Connecticut today. While before the Civil War, the writs in actions against municipalities may "have issued against the *inhabitants* of towns, societies, and districts, *as parties*," (emphasis in original) *Beardsley* v. *Smith*, supra, 378, this is no longer the case. The writ in the present case, for example, was issued against the "City of Waterbury." Perhaps even more importantly, the "notice" assertedly received by the inhabitants whose property is supposedly subject to seizure would hardly comply with modern notions of due process. See *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950). In a modern class action, for example, it is fundamental that members of the class affected be given proper notice of the pendency of the action and subsequent proceedings in it. Practice Book § 90.

At this stage of the case, however, there is no need to pass on the continued general vitality of *Beardsley* v. *Smith*, supra. As far as court and counsel are aware, no actual execution upon a municipal resident's property has occurred in Connecticut in this century. The specific concern raised here is, in any event, quite different. It is that the *jurors* in the present case will be frightened that their *own* property may be seized if they deliver a verdict against the city. As a practical matter, the court is doubtful that many jurors will be well versed in the vagaries of nineteenth century common law. For obvious reasons, no jury would ever be instructed on this point. More fundamentally, however, it should and must be clear to all that an execution upon a *juror's* property to enforce a verdict that he or she had rendered would be an act so monstrous and so patently destructive of the integrity of the jury system that it has never occurred and, this court is confident, will never occur as long as the idea of law endures. The age when jurors could be punished for their verdicts

ended with *Bushell's Case,* 124 Eng. Rep. 1006 (C.P. 1670). No juror should for one moment fear execution upon his property as a result of his verdict, and, the court is confident, none does.

## VI

### DEMOGRAPHIC CHANGES

When *Bailey* v. *Trumbull,* supra, was decided, Connecticut was a state of small towns. In 1850, Trumbull had a population of 1309. Only three towns in the state had populations of over 10,000: New Haven, with 20,345; Hartford, with 13,555; and Norwich, with 10,265. State of Connecticut, Register and Manual (1992) pp. 616–18. Moreover, the population was relatively homogeneous. In any event, the citizenry of the state, from which jurors were drawn, was exclusively white until 1865. *Opinion of the Judges,* 32 Conn. 545 (1865). Under these circumstances, the exclusion of a single town from the jury pool might not have materially affected the representative nature of the array. This, to put it mildly, is no longer the case.

This case involves the judicial district of Waterbury in 1992. The judicial district of Waterbury consists of eight towns. The following chart, compiled from 1990 census data, vividly shows some demographic characteristics of the utmost importance to the present case.

| Town | Population | African-Americans | Hispanic Origin |
|---|---|---|---|
| Middlebury | 6145 | 19 | 47 |
| Naugatuck | 30625 | 567 | 950 |
| Prospect | 7775 | 157 | 93 |
| Southbury | 15818 | 95 | 152 |
| Waterbury | 108961 | 14133 | 14578 |
| Watertown | 20456 | 151 | 245 |
| Wolcott | 13700 | 215 | 143 |
| Woodbury | 8131 | 45 | 87 |
| Total | 211611 | 15382 | 16295 |

(Compiled from Connecticut State Data Center, Connecticut Population and Household Characteristics, 1990 Census Complete Count Data—Part A [1991]).

It appears from this chart that the city of Waterbury has over 51 percent of the total population of the district, over 91 percent of the African-American population, and over 89 percent of the Hispanic population. To remove this group, in its entirety, from the jury pool would bring about profound consequences undreamed of by the *Bailey* court. The cross-section requirements of the state and federal constitutions would be vitiated.

## VII

### Is *Bailey* CONTROLLING?

The law ignores these developments at its peril. Although *Bailey* may be taken as an accurate statement of the law as understood by many American courts at the time, it is now an anachronism. Even if it were applied so as to disqualify categorically the residents of a relatively small town, the likelihood of its rule being retained by the modern Supreme Court must be considered minimal. If applied to disqualify all residents of the city of Waterbury, with the demographic consequences indicated, however, the issue is hardly in doubt. The Supreme Court has acknowledged that: " 'The common law is not static, but is a dynamic and growing thing and its rules arise from the application of reason to the changing conditions of society.' *McCormack* v. *Oklahoma Publishing Co.*, 613 P.2d 737, 740 (Okla. 1980)." *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 127, 448 A.2d 1317 (1982).

*Bailey,* of course, is an existing precedent of a higher court. It cannot, however, be considered controlling or authoritative in the present case. If this court were to disqualify categorically all Waterbury jurors, it would

disqualify over half of the total populace of the judicial district of Waterbury, and approximately 90 percent of the district's minority population. *Bailey* is simply too slender a reed to bear this weight. Its statement on the law of disqualification is technically dicta, the case concerned only a single juror who was a large landowner in a small town, and the profound demographic and constitutional issues now before the court were not even mentioned—nor could they have been, given the state of the law and of society at the time.

Under these circumstances, the court is confident that it is modern law, rather than archaic law, which must be followed. "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the [law] lays down no particular tests and procedure and is not chained to any ancient and artificial formula." *United States* v. *Wood,* supra, 145–46.

The motion is denied.