**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANK TAYLOR,

*Petitioner-Appellant,*

v.

D. K. SISTO,

*Respondent-Appellee.*

No. 09-15341

D.C. No.
2:06-cv-02878-
GEB-CHS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
February 9, 2010—San Francisco, California

Filed May 25, 2010

Before: John T. Noonan, Marsha S. Berzon and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Noonan;
Dissent by Judge Ikuta

**COUNSEL**

Deanna F. Lamb, Central California Appellate Program, Sacramento, California, for the petitioner-appellant.

David Andrew Eldridge, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

## OPINION

NOONAN, Circuit Judge:

Frank Taylor, a California state prisoner, appeals the judgment of the district court denying his petition for habeas corpus. We reverse the judgment.

## FACTS

Early morning September 9, 2002, Frank Taylor was driving his wife's car. For reasons undisclosed by the record she had reported the car to the police as stolen. Officer Halk called in the license number. The dispatcher told him that the car was stolen. Halk gave chase and called for backup. Eventually, Halk's patrol car and another patrol car boxed Taylor in his wife's car into a driveway and signaled to Taylor to obey orders from the police. Taylor backed up his car until it touched Halk's, then revved his engine and pushed the patrol car backwards, forcing Halk to jump into his car to avoid injury. Taylor then drove on to the sidewalk and briefly escaped. He led the police on a chase in which he sped at speeds from 60 to 100 miles per hour, ignoring speed limits and stop signs. Ultimately, he crashed into a truck and was captured.

## PROCEEDINGS

Taylor was charged with evading a peace officer in violation of California Vehicle Code § 2800.2(a) and assault with a deadly weapon on a peace officer in violation of California Penal Code § 245(c).

At the start of jury selection the trial judge gave this admonition to the prospective jurors:

> The reason that being a juror is hard is because it's probably the only time in your life that you are ever

asked to take all of the experiences that you have had that have contributed to how you think about everything that you think about and to lay those experiences aside and to only make your decisions based upon what you hear that goes on in this trial, that you hear in this courtroom, and upon that, you must make your decision.

So I ask you to imagine as prospective — as jurors, that there is a large box at the doorway to this courtroom. And when you walk into this courtroom as a juror, you take all the decisions that you have made, all the opinions you have about how people act, how people behave, what kind of people behave in what way, what makes them do that, and you leave them in that box. We call them your biases and your prejudices, and we all have them. We depend upon those biases and prejudices in our normal lives a lot of times, but you can't depend upon them when you are jurors.

The only thing that we ask you to walk into this courtroom with is your common sense, and that serves you well as a juror, and that's why it's the second hardest job in the world [the most difficult job being that of a parent], but that's what we call upon you to do.

The court's reference to the "box" and to the putting aside of experience came up during the questioning of ten potential jurors, eight of whom were dismissed. Mr. L, who was dismissed, stated that "[t]he judge told us yesterday to put personal experiences at the door, and if I'm selected as a juror, I would do my best to put that aside, but . . . I might have a tough time doing that . . . ." Ms. D, who was also dismissed, did not understand the challenged admonition. When questioned outside of the presence of the other potential jurors, she told the judge that she could set aside her personal experience

with sexual assault if the charge did not have elements of sexual of assault, but that she would have "a greater difficulty of putting aside just my everyday experience, because I think that's what my common sense is based on, is my everyday experience. So I would be hard-pressed to put that aside and still have my common sense." The court clarified the admonition as follows:

> The Court: Let me see if I can make it clearer to you . . . so you can be clear with us.

> Your everyday experience, like knowing that the sun comes up in the west and sets in the east — comes up in the east and sets in the west, whatever it does, and those kinds of things, that nightfall is the end of the day, that's pretty common sense; that if you throw things up in the air, they'll fall down to the ground, that's what we're talking about, common sense, the kind of judgment that we make. Prejudice and judgments have kind of the same root.

> Prospective Juror D: Oh, Okay.

> The Court: That all people with blue eyes act in this particular way, all people with black skin act in that particular way, those are the kind of judgments that you leave in the box outside my courtroom.

During the sequestered questioning of Mr. T, whom the court dismissed for cause, Mr. T stated that he would not be able to put "in the box" his experience of having a brother who was beaten and called racial epithets by sheriffs' deputies.

During the questioning of the other jurors in open court, the court referred to the "box" as "experiences . . . that might affect your judgment." The judge asked individual potential jurors if they could put particular personal experiences "in the box." For example, the court asked Mr. J, whom the prosecu-

tor ultimately dismissed, about an experience being subjected to an arrest warrant for a different person with the same name. When Mr. J said that he could be objective, the court asked,"[a]nd your experience with law enforcement would remain in my box out there while listening to the testimony of law enforcement officers?" The court asked other potential jurors if they could set aside the following experiences:

- Mr. K (dismissed): "experiences with your sons that might affect your ability to be fair and impartial" and "feelings" that the potential juror might have if the charged crime was similar to one in which his son had been involved.

- Juror No. 4: "personal experiences" that might create sympathy, referring to the juror's experience being questioned by a grand jury.

- Mrs. W (dismissed): "experiences like that that might affect your judgment" that must be "control[led] in this particular setting," referring to prior experiences with law enforcement.

Defense counsel also brought up the "box" in questioning three potential jurors, two of whom he dismissed. Ms. G, who had been prosecuted for a DUI, stated that she did not understand what the "box" was, and counsel clarified that he meant whether her experience of having committed a crime and been prosecuted "will affect your ability to be fair to both sides in this case." Counsel asked Ms. T, whose husband was a retired peace officer, whether she could leave anything she might have heard from her husband "in the proverbial box outside the courtroom." Counsel also asked Juror No. 8 whether he could "leave in the box" the "whole experience" of having his father incarcerated for murder, or "whether there is part of that experience that may affect your attitude toward either side in this proceeding."

At the close of evidence, the court did not refer to the "box" or personal experiences. The court instructed the jury that it "must not be influenced by pity for or by prejudice against a defendant" and that it must "not be biased against the defendant because he's been arrested for this offense, charged with the crime, or brought to trial." The court instructed the jury that it "must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling," and that it "must decide all questions of fact in this case from the evidence received in this trial, and not from any other source," giving as examples visits to the location and consulting reference works. The court also instructed the jury that it might draw inferences from circumstantial evidence. It instructed that the jury is "not bound to decide an issue of fact in accordance with the testimony of number of witnesses which does not convince you as against the testimony of a lesser number or other evidence which appeals to your mind with more convincing force." Finally, the court instructed the jury on reasonable doubt.

During voir dire, Taylor had objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *People v. Wheeler*, 583 P.2d 748 (Cal. 1978), to the prosecution's use of peremptory challenges to strike three jurors: Mrs. W, whom the trial court assumed to be Hispanic, Mr. L, who was of Southeast Asian descent, and Ms. D, who was African-American. The trial court rejected Taylor's motions.

The jury acquitted Taylor of assault with a deadly weapon but convicted him of the lesser included offense of assaulting a peace officer in violation of Penal Code § 241(b). It convicted him of evading a police officer. Under California's "three strikes" system, he was sentenced to imprisonment for 26 years to life.

Taylor appealed to the state court of appeal for the third district. His first ground was what the appeal court labeled

"the preinstruction of the jury," that is, what Taylor described as "the dehumanizing of the jury."

Taylor had not objected to the preinstruction. The Court of Appeals said that nonetheless it would review his objection now. The court declared: "Read in context, and contrary to defendant's view, the instruction, although a bit odd, did not create a jury of 'automatic robots with sterilized minds' . . . . In context, the instruction did not command the jurors to ignore life experiences."

The Court of Appeals then addressed the *Wheeler/Batson* objections, citing California cases that specifically rejected Ninth Circuit precedents in this area. The court held that the prosecutor's stated reasons for his objections were race-neutral and sincere. The court also rejected Taylor's additional claims regarding the instructions on Vehicle Code § 2800.2(a), which were raised for the first time on appeal. The Supreme Court of California summarily affirmed.

Taylor filed a habeas petition in federal court, raising the same claims brought on direct appeal. The district court denied his petition. This appeal followed.

## ANALYSIS

*The Standard of Review*. We review the decision of the California court of appeal. We are bound by federal statute to affirm unless the decision "was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly-established" law consists of the holdings not the dicta of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

*The Judge's Box*. With a wonderfully concrete image, the trial judge instructed all the prospective jurors in this case that "they must as jurors, take all the decisions that you have

made, all the opinions you have about how people act, how people behave, what kind of people behave in what way, what makes them do that, and you leave them in that box." He told them that they must "take all of the experiences that you have had that have contributed to how you think about everything that you think about" and "lay those experiences aside."

The instruction was an unqualified directive that each juror disregard his or her own life experience. The instruction included a reference to "your biases and your prejudices" but perversely or paradoxically stated that the jurors' experiences were what "we call your biases or your prejudices." Sweepingly, the instruction asked the prospective jurors to deposit *all* their experience in the judge's disposal box.

The judge's colloquies with individual prospective jurors showed that the judge was not joking. The responses of individuals in the voir dire show them taking the judge's instruction equally seriously. The judge's only attempt to explain what he meant consisted in the statements that a juror could use her experience to know what nightfall was and where the sun rose or set. Nightfall and sunrise are universal facts, not experiences that may be particular to an individual juror. Nothing in this explanation permitted a juror to draw on the personal experiences that make up human life.

The Court of Appeals characterized the preinstruction as "a bit odd," but defensible "in context." The Court of Appeals did not specify the context to which it referred. The only context that was apparent was the context of the criminal trial in which the jury had a key role. It was in that context that the potential jury members were told to shed their life experience.

[1] A reviewing court must consider "the reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). It might be argued that the instruction was harmless

because it could not have been obeyed — no one can completely discard life experience. But juries are presumed to obey their instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The colloquies with members of the voir dire show them grappling with the instruction. To follow it completely may have been impossible, but it set a goal which jurors were instructed to achieve. The instruction, in context, created a pool of prospective jurors who were seeking to strip themselves of part of what made them human.

**[2]** The standard instructions to the jury did not cure the deficiency. These instructions on evidence and on reasonable doubt, were not framed to correct or neutralize the preinstruction, whose central image had played such a prominent part in the voir dire.

Did the preinstruction contradict or unreasonably apply a holding of the Supreme Court? We conclude that it unreasonably applied a series of holdings concerning the nature of trial by jury under the Sixth Amendment.

**[3]** "[T]he essential feature of a jury . . . lies in the interposition between the accused and his accuser of the common-sense judgment of a group of laymen." *Williams v. Fla.*, 399 U.S. 78, 99 (1970). This fundamental precept has been recognized in a diverse series of Supreme Court cases. In *Head v. Hargrave*, 105 U.S. 45 (1881), Justice Stephen Field, writing for a unanimous court, reversed a judgment when the jury had been instructed to be "governed by the opinions of the experts" in evaluating the value of the legal services whose amount was in controversy. The instruction, Justice Field wrote, "in effect, forbade them to exercise their own knowledge and ideas." *Id*. at 51. "So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion." *Id*. at 49. The error in instructing the

jury to discard their own knowledge was fundamental and fatal.

*Head* was a civil case, and so did not involve the Sixth Amendment, but a long line of Supreme Court cases establishes that criminal defendants are entitled to be judged by "a body truly representative of the community." *Smith v. Texas*, 311 U.S. 128, 130 (1940). The requirement of representativeness explicitly connects the right to trial by an impartial jury to the varied and unique experiences that Americans of different backgrounds bring into the jury box.

In *Glasser v. United States*, 315 U.S. 60, 85 (1942), the Supreme Court noted that the Constitution as originally drafted guaranteed only that "the trial of all crimes . . . shall be by jury," but "the people and their representatives . . . were quick to implement that guarantee by the adoption of the Sixth Amendment which provides that the jury must be impartial." The Supreme Court went on to hold that the "selection of jurors from the membership of particular private organizations" is impermissible because it does not "comport with the concept of the jury as a cross-section of the community." *Id.* at 86.

Around the same time, the Supreme Court struck down a procedure for jury selection that excluded low wage laborers. The Supreme Court observed that such laborers "constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 223 (1946). In *Ballard v. United States*, 329 U.S. 187 (1946), reversing a criminal conviction because the jury was composed exclusively of men, Justice William O. Douglas wrote: "The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community of both . . . . a distinct quality is lost if either sex is excluded." *Id.* at 193-94.

*Ballard* was grounded in the supervisory power of the Supreme Court over the federal judiciary. *See* 329 U.S. at 193. *Ballard* has been relied on in subsequent Supreme Court cases interpreting the Sixth Amendment right to trial by an impartial jury and the Equal Protection Clause. *See, e.g.*, *J.E.B. v. Alabama*, 511 U.S. 127, 133 (1994); *Taylor v. Louisiana*, 419 U.S. 522, 527, 531 (1975). *Ballard* quoted approvingly from the dissenting opinion in the Ninth Circuit, which explained that women should have been included in the jury pool precisely because women may possess singular experiences and beliefs that could have influenced their assessment of the defendant's culpability. *See* 329 U.S. at 194-95.

In *Peters v. Kiff*, 407 U.S. 493 (1972), reversing a conviction of a white man for burglary by a jury composed exclusively of whites, Justice Thurgood Marshall wrote that

> we are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.

*Id*. at 503. Justices Douglas and Stevens joined this opinion. Justices White, Brennan, and Powell concurred, stating that the court here proclaimed a new rule "governing criminal proceedings instituted hereafter." *Id*. at 507 (White, J., concurring).

**[4]** In *Taylor v. Louisiana*, the Supreme Court again emphasized that "the fair-cross-section requirement [i]s fundamental to the jury trial guaranteed by the Sixth Amendment." Invoking "the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps . . .

biased response of a judge," *Taylor* made clear that the constitutional right to a jury pool comprised of a "fair cross-section" of the community derives from the importance of bringing a broad spectrum of juror life experiences to bear on the process of adjudicating guilt. 419 U.S. at 530.

More recently, in *J.E.B. v. Alabama*, reversing a judgment in a state paternity case, in which the exercise of peremptory challenges had eliminated all the men in the jury pool, Justice Harry Blackmun, writing for the court, quoted: "Restricting jury service to only special groups or excluding identifiable segments playing majority roles in the community cannot be squared with the constitutional concept of jury trial." 511 U.S. at 134 (quoting *Taylor*, 419 U.S. at 530). "The diverse and representative character of the jury must be maintained 'partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' " *Id.* (quoting *Taylor,* 419 U.S. at 530-31).

**[5]** These cases establish that a jury is meant to be made up of human beings whose experience is vital to the validity of the verdict. The cases stand as indices to the particular kind of experience that a man or woman, a black person or a white person, a low-wage laborer as distinct from a well-paid desk worker may be expected to bring to service as a juror. In the recognition of the need for diversity there is recognition of the role of the experience of the jurors. That the jurors must be human is an axiom. That humanity implies experience is also axiomatic. The Sixth Amendment, as incorporated by the Fourteenth Amendment, guarantees the right to "trial by an impartial jury," U.S. Const. Am. VI; *Duncan v. Louisiana*, 391 U.S. 145 (1968). The holdings of the Supreme Court confirm that an impartial jury is one that applies common sense informed by the full range of human experience. The "box" instruction affirmed by the California Court of Appeals instructed the jury to abandon that experience.

**[6]** The statute governing habeas recognizes "that even a general standard may be applied in an unreasonable manner."

*Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). In our case, the Court of Appeals engaged in an "unreasonable application" of federal law, as established by the holdings of the Supreme Court. Applying the law to the facts of Taylor's case, the state court "ignor[ed]the fundamental principles established by [the Supreme Court's] most relevant precedents." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007).

Judge Ikuta's earnest dissent requires a response: In this case we are applying a first principle: juries are made up of human beings. One would not expect that principle to be denied by any court and so one would not expect that the Supreme Court would have occasion to enunciate it in so many words. But as the decisions we have cited do demonstrate, courts have occasionally acted as though the experience of diverse human beings can be eliminated from a jury, and the Supreme Court has accordingly had to vindicate the essential requirement of diversity of humans.

"Not one of these cases formulates a rule regarding how individuals in the venire pool should use their life experiences if seated on a jury," the dissent observes. Exactly so. We did not seek or set a rule as to how jurors should use their life experiences. We are declaring that the established constitutional functions of a jury forbids the elimination of such experiences.

**[7]** Why did such exclusion do injury to the defendants in these cases? The defendants obtained reversals of their convictions not because the rights of fellow citizens had been violated but because they, the defendants, had been deprived. That deprivation was deprivation of the diversity of human experience to which the defendants were entitled and which is the governing principle here.

As the Supreme Court held:

AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.' *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment). Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.' *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

*Panetti*, 551 U.S. at 953.

Because we grant Taylor's petition based on his challenge to the preinstruction, we do not reach Taylor's additional claims.

The judgement of the district court is REVERSED and the case REMANDED with direction to the district court to issue a writ of habeas corpus.

---

IKUTA, Circuit Judge, dissenting:

Once again, this court disregards both the language of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") and the Supreme Court's repeated direction not to grant habeas petitions unless the state court's adjudication of the petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

In this case, the trial court instructed prospective jurors to put their biases and prejudices into a metaphorical "box" outside the courtroom, and to use only their common sense while acting as jurors. Taylor's counsel did not object to this

instruction. On appeal, Taylor claimed that the instruction violated his Sixth Amendment right to a jury because the instruction denied him the "common-sense judgment of a jury" of his peers by requiring the jurors to ignore their life experiences. The California Court of Appeal held that "the instruction, although a bit odd, did not create a jury of 'automatic robots with sterilized minds,' " and did not vitiate the trial court's reasonable doubt instruction to the jurors, which they are presumed to follow.

It is readily apparent that this decision does not conflict with any "clearly established" Supreme Court precedent. As the Supreme Court has repeatedly explained, its precedent is "clearly established" only if it squarely addresses an issue in the state case or clearly extends to a similar factual context. *See, e.g.*, *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (per curiam) (Supreme Court precedent must "squarely address[ ]" the question at issue); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (Supreme Court precedent must "require" the state court to reach a conclusion); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (Supreme Court precedent must enunciate a principle that applies in an analogous case).

Although the majority has scoured over a century of Supreme Court decisions, none of the cases it cites "squarely address" the question whether the voir dire instruction at issue here violates the Sixth Amendment, *see Van Patten*, 552 U.S. at 125, or announces a principle clearly applicable to this case, *see Panetti,* 551 U.S. at 953. All but one of the opinions cited by the majority address a different question: whether excluding an identifiable group from the jury pool violates statutory or constitutional principles.[1] The only case not con-

---

[1]J.*E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 130-31 (1994) and *Ballard v. United States*, 329 U.S. 187, 193 (1946) held that the systematic exclusion of individuals on the basis of gender from grand and petit juries violated the equal protection clause and relevant federal statutes, respectively. *Smith v. Texas*, 311 U.S. 128, 131-32 (1940) held that a complete absence

sidering this jury pool issue held that a trial court erred in instructing jurors in a civil case to rely on the testimony of expert witnesses, rather than on their own judgment. *Head v. Hargrave*, 105 U.S. 45, 50 (1881).

Not one of these cases formulates a rule regarding how individuals in the venire pool should use their life experiences if seated on a jury. Nor, as the majority itself acknowledges, does any case enunciate the so-called "first principle" that courts may not eliminate "the experience of diverse human beings" from a jury. Maj. Op. at 7463. While these cases do contain scattered dicta, broad aphorisms, and general observations regarding the "kinds of harm that flow from discrimination in jury selection," *Peters*, 407 U.S. at 498, such remarks do not amount to "clearly established Federal law" on the Sixth Amendment issue presented here. Under AEDPA's "highly deferential standard for evaluating state-court rulings," *Renico v. Lett*, No. 09-338, slip op. at 5 (May 3, 2010) (internal quotation marks omitted), we cannot reverse a state court's ruling for being an unreasonable application of inferences drawn from such isolated phrases. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of this Court's decisions . . . .").

Even if the majority's handful of cases could stand for a general principle requiring juries to apply "common sense

of African-Americans from grand jury lists violated the defendant's equal protection rights. *Peters v. Kiff*, 407 U.S. 493, 501 (1972) held that the systematic exclusion of African-Americans from both the grand jury and the petit jury pools denied the defendant due process. *Glasser v. United States*, 315 U.S. 60, 86-87 (1941), *superseded on other grounds by rule as stated in Bourjaily v. United States*, 483 U.S. 171, 181 (1987), held that selecting jurors from membership lists of private organizations would violate a defendant's constitutional rights. And *Thiel v. S. Pac. Co.*, 328 U.S. 217, 224 (1946) held that a federal court could not exclude daily wage earners from a jury panel.

informed by the full range of human experience," Maj. Op. at 7462, we could still not say that the California Court of Appeal's decision here was objectively unreasonable. The "more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Lett*, slip op. at 8 (alterations in original) (internal quotation marks omitted) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009). Here, the state appellate court reasonably concluded that the voir dire instruction, read in context, "did not command the juror to ignore life experience." Even if this conclusion is wrong, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lett*, slip op. at 5 (internal quotation marks omitted). AEDPA "demands that state-court decisions be given the benefit of the doubt." *Id.* (internal quotation marks omitted).

In sum, the majority has strayed far from the Supreme Court's AEDPA jurisprudence in granting the writ in this case. Under the explicit terms of § 2254(d)(1) and the oft-repeated direction of the Supreme Court, habeas relief is unauthorized. As a result, I fear this decision is set to join the long line of Supreme Court reversals of decisions by our court that decline to take AEDPA seriously. *See McDaniel v. Brown*, 130 S. Ct. 665, 666 (2010) (per curiam); *Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam); *Hedgpeth v. Pulido*, 129 S. Ct. 530, 530-31 (2008) (per curiam); *Kane v. Garcia Espitia*, 546 U.S. 9, 9-10 (2005) (per curiam); *Schriro v. Smith*, 546 U.S. 6, 7 (2005) (per curiam); *Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam); *Woodford v. Visciotti*, 537 U.S. 19, 20 (2002) (per curiam); *Early v. Packer*, 537 U.S. 3, 4 (2002) (per curiam); *Stewart v. Smith*, 536 U.S. 856, 857 (2002) (per curiam). I respectfully dissent.